### In re THOMPSON.

#### (District Court, S. D. New York. March 24, 1903.)

#### No. 3,240.

1. BANKRUPTCY—JURISDICTION OF COURT—ORDER AGAINST ASSIGNEE.

A court of bankruptcy has jurisdiction to bring in an assignee for the benefit of creditors of the bankrupt under an assignment which constituted an act of bankruptcy, and to require him to turn over to the trustee or account for the property which came into his hands under the assignment.

2. CHATTEL MORTGAGE—FAILURE TO RECORD—VALIDITY AS AGAINST ASSIGNEE.

An unrecorded chattel mortgage which is good between the parties is valid as against the mortgagor's assignee for the benefit of creditors.

¶ 2. See Chattel Mortgages, vol. 9, Cent. Dig. § 256.

In Bankruptcy.   On review of decision of referee.
The following is the opinion of Referee Coxe:

William Thompson, the bankrupt above named, was, on and prior to November 27, 1900, engaged in the livery stable business, at No. 57 Irving Place, borough of Manhattan, New York City. On said 27th day of November, 1900, Thompson made, executed, and delivered a general assignment for the alleged benefit of his creditors to Herman R. Murray, under which assignment the said Murray duly qualified and entered into possession of the property formerly belonging to Thompson.

On December 4, 1900, William B. Parkinson and others filed a petition in this court in involuntary bankruptcy against Thompson, and thereafter, on December 26, 1900, Thompson was duly adjudicated an involuntary bankrupt. On February 26, 1901, Isaac C. Wilson was duly elected by the creditors trustee of the estate in bankruptcy, and he thereupon duly qualified, and has since been acting as such trustee.

On March 4, 1901, upon the application of said trustee in bankruptcy, an order was made by the district judge of the United States for this district, directing that Herman R. Murray "forthwith deliver to said Isaac C. Wilson, trustee herein, all books, papers, and documents of any description now in his possession relating to the estate of William Thompson, bankrupt, and that he present in this court, at a term thereof to be held at the post office building, in the borough of Manhattan, city of New York, on the 6th day of March, 1901, at 10:30 o'clock in the forenoon, or as soon thereafter as counsel can be heard, an account of all the moneys and papers received by him belonging to the said estate of William Thompson, bankrupt, and thereupon deliver and pay over to said Isaac C. Wilson, trustee, all property and moneys as the court shall direct." Thereafter, and by an oral order of said United States district judge, the matters included in said order were referred to the undersigned, being the referee in charge of the case, for further proceedings. No question is made that this is the purport of the oral order, both the counsel for the trustee and the counsel for the assignee joining in a statement on the record to that effect.

Pursuant to this order, said Herman R. Murray was examined, and submitted an account of his receipts and disbursements as assignee. In this account the only assets with which the assignee charges himself are collections made on certain accounts due the bankrupt, assignor, amounting in the aggregate to $1,138.97. As against this the assignee credits himself as follows: Wages earned within three months of bankruptcy, $398.75; petty disbursements, $8.52; wages for labor subsequent to the assignment, $166.05; gas bills, $73.80; fee of counsel for assignee, $250.00; premium on assignee's bond, $20.00—leaving a balance of $221.85, which the assignee either has paid or is ready to pay over to the trustee.

The trustee objects to all of the items of credit above set forth, except the first two; and, as the result of the examination in these proceedings of the bankrupt and the assignee and other witnesses, he further claims that the assignee has wrongfully appropriated other property of the bankrupt, and that he should be compelled to surrender the same or its proceeds to the trustee in bankruptcy, in addition to the sums above objected to. In order to arrive at a conclusion, it will be necessary to consider all these claims together.

It appears that at the time of the assignment there were upon the property of the bankrupt certain chattel mortgages. According to the testimony of Mr. Murray, there was a first mortgage, covering certain horses, in favor of Fiss, Doerr & Carroll, upon which there was due $400. There was a second mortgage in favor of Hincks & Johnston, executed January 21, 1899, covering all the property the assignor had in his business (except perhaps the harness and electric motor, covered by the Murray mortgage hereinafter mentioned), and including many carriages, as well as horses and other property, which mortgage was given to secure an indebtedness of $46,757.10, of which there was claimed to be due at the time of the assignment $29,150. There was also another mortgage in favor of Herman R. Murray, likewise executed January 21, 1899, to secure $5,625, and covering 21 horses, 20 sets

of harness, and 1 electric motor. On this mortgage $1,000 had been paid, leaving an indebtedness thereon, at the time of the assignment, of $4,625. The horses covered by the Fiss, Doerr & Carroll mortgage were also included in the Hincks & Johnston mortgage, it being a second mortgage as to them, and the 21 horses covered by the Murray mortgage were also included in the Hincks & Johnston mortgage, it being a second lien as to them.

Murray, at the time of the assignment, was, and for many years had been, a member of the firm of Hincks & Johnston, who were carriage makers of Bridgeport, Conn.

Upon the assignment, Hincks & Johnston, with the permission of Murray, the assignee, took under their mortgage, as is testified by the partner Hincks, between 50 and 60 carriages. There is some conflict of testimony as to precisely the number of carriages taken by them, some of the witnesses placing the number higher than Mr. Hincks, especially with regard to certain hansoms, all the other witnesses testifying that there were 10 or 12 more hansoms than were accounted for by Mr. Hincks. However this may be, it seems that Hincks & Johnston took all they considered necessary in order to satisfy their debt, so that they were willing to forego any claim upon the horses, harness, or other property. Mr. Hincks at the hearing of June 13, 1901, repeatedly stated, in the most clear and positive terms, that Hincks & Johnston made no claim on the horses and other property except the vehicles, and that they waived all claim to such property.

Mr. Hincks testified as follows: "Q. This mortgage, Mr. Hincks, appears to cover other property than carriages. A. Yes. Q. What became of that other property? A. I don't know. I say I don't know officially. We had nothing to do with it at all. I told Mr. Murray that I didn't care to bother with horses or property of that kind, and the assignee took it. Q. So that the firm of Hincks & Johnston made no claim to 119 horses, or about that number, that were covered by this chattel mortgage? A. No, sir; we had nothing to do with the horses or other property, except the carriages. Q. What became of those horses? A. I don't know. I suppose they were sold by the assignee. Q. And you wish to be understood as saying that you waive all claims— A. We waive all claim to all of that property. Q. And also to all robes and liveries and harness? A. Yes. * * * Q. You never claimed to take that property? A. No; we never had any property except the carriages at any time."

And, being again questioned upon this subject, Mr. Hincks testified as follows: "Q. With reference to the horses that appear on the schedule, and all the other property that appears in the mortgage, I understand you to say that you waive all claim to those? A. Yes, sir; they haven't come into our possession at all, and we didn't assert any claim and we never shall. Q. Therefore you waive any rights to those that you might have under the mortgage? A. Don't understand me as waiving any rights of Mr. Murray. I am speaking now for myself and Mr. Johnston. I don't know that I ought to speak for Mr. Murray; but as an entity, the firm of Hincks & Johnston, those don't enter into its assets at all. Q. They are waived by that firm? A. Yes."

I am unable to understand this testimony otherwise than as asserting that the firm of Hincks & Johnston waived all claim of lien to any of the property covered by their mortgage, except the carriages; that they, of course, did not assume to waive any rights of Mr. Murray individually, but that all the rights of the firm of Hincks & Johnston, including whatever rights Mr. Murray had as partner of that firm, were waived. This being so, it would follow that all the balance of the property covered by this mortgage which was not covered by either the Fiss, Doerr & Carroll or the Murray mortgage would revert to the assignor for the benefit of his general creditors. And this is the contention of the trustee. On the contrary, Mr. Murray, the partner of Hincks & Johnston, and the assignee for the benefit of all the creditors, took not only the property covered by his own mortgage, but substantially all the other property of the assignor which had not been taken by his partners, to the entire exclusion of all the general creditors, of whom there are over 40, holding claims amounting in the aggregate to more than $18,000.

When confronted with this testimony of Mr. Hincks, Mr. Murray upon a subsequent day had Mr. Hincks appear again before the referee, who, under the objection of the trustee's attorney, attempted to explain his former testimony by stating substantially that what he meant to say was that the firm of Hincks & Johnston had released or assigned or given to Murray the lien under the Hincks & Johnston mortgage on the balance of the property other than the carriages. But I hardly think that this position is tenable. The acts of Hincks & Johnston, as well as the clear and positive testimony of Mr. Hincks, show that they considered their mortgage satisfied when they took the vehicles. They state that they sold some at once, and that others they took to their factory in Bridgeport and were repairing and renovating them for the purpose of reselling, and from the testimony it is not unreasonable to infer that as a matter of fact they secured repayment in this manner of their entire debt. Furthermore, it is hardly credible that unless they were paid they would voluntarily have relinquished all this valuable property without consideration. But even assuming that this was not so, and that they owned something which could be assigned to Murray, there was, and under the circumstances could be, no assignment. It is not claimed that it was in writing, and a consideration running from Murray to Hincks & Johnston is entirely lacking. The only consideration suggested by Mr. Hincks is that Murray was to ship the carriages to them without charge, but this might well have been Murray's legal duty as assignee, as if the property was to be made to realize more by such action.

Murray paid to Fiss, Doerr & Carroll the amount of $400 due upon their mortgage, and the horses covered thereby came under the lien of the Hincks & Johnston mortgage, under which they were sold and the proceeds appropriated by Murray.

On the evidence I am constrained to hold that all that Murray was entitled to hold as a secured creditor, and as against the general creditors, is the property covered by his own mortgage, together with the $400 paid to Fiss, Doerr & Carroll.

The testimony as to the precise number of horses in the stable at the time of the assignment is conflicting. The witnesses Walsh and Sadler estimate the number at 70, and the witness Lennon at 75. Mr. Murray testifies that there were 63 horses in all, of which he says that 10 were boarders or belonged to other people, and were taken away by their owners, leaving 53 belonging to the bankrupt at the time of the assignment. Now, Murray's mortgage covered only 21 horses, and it is presumable that some may have died or been sold between the execution of the mortgage and the assignment; indeed, Murray himself in his examination says there "were a good many short." But giving him credit for the full number of 21, and on his own testimony as to the number in the stable being but 53, there appears to have been 32 horses taken by Mr. Murray on this account. The testimony shows $100 each to be a conservative estimate of the value of these horses, and I think that on this account Murray should surrender to the trustee the amount of $3,200, less the $400 paid to Fiss, Doerr & Carroll, or the sum of $2,800. From the assignee's own inventory it appears that some 42 sets of harness, appraised for the assignee at the sum of $935, were on the same theory taken by Murray. It is not claimed that the 20 sets of harness covered by Murray's own mortgage are included in these, and I therefore conclude that Mr. Murray should account to the trustee in bankruptcy for the value of this harness, to wit, $935.

In this same inventory likewise are put down the following items: Lot of robes and blankets, valued at $30; office furniture, valued at $100; quantity of livery coats, valued at $150. There is grave discrepancy between Mr. Murray and the other witnesses as regards the quantity and value of this property. The appraisal, like that of the harness, was made by the assignee's own appraisers. That these appraisals are at least low enough is indicated by the fact that the electric motor, which was included in Murray's own mortgage, appraised at $100, brought, when sold, $250. The property was not sold at public auction, but to various parties in the stable at private sale, and it is testified that, as to much of it, the persons to whom it had been sold at private sale, immediately, and in the same place, sold it at

auction. Presumably at this auction sale these purchasers obtained a profit over what they had paid for the property to Mr. Murray, and it might well be, upon all the evidence, that Mr. Murray should be charged with a larger amount than that at which he values this property. I have concluded, however, to take the assignee's own valuation as to these items, and find, therefore, that he is further indebted to the trustee in bankruptcy on these accounts in the amount of $280.

In the Hincks & Johnston mortgage were further included 18 other horses. It appears from the testimony that on or about July 1st, preceding the assignment, 20 horses were sent by Thompson to Murray's farm at Canastota, N. Y., to be turned out to pasture, and that Murray kept them there for five months at the price of $10 per month. Two of these horses died during this time. After the assignment, Murray sold these horses for $1,700. His lien for the keep of these horses, according to his own statement, is $900, and this seems to be a liberal amount, since it is testified that from $6 to $8 a month is the usual charge for pasturage. I am disposed, however, to allow Mr. Murray the full amount he claims on this account, and it therefore follows that he is indebted to the trustee in bankruptcy for the balance of the amount received at the sale of these horses, over the lien for keep of $900, that is to say, $800.

It further appears that one Frank A. O'Donnell claimed to have a mortgage, on eight other of Thompson's horses, and that the assignee, Murray, upon this theory, let Mr. O'Donnell take eight horses out of the stable. It appears, however, that he did so on the mere statement of Mr. O'Donnell that he had a mortgage, and without any investigation whatever as to the fact, or as to whether the mortgage, if otherwise valid, had ever been filed or recorded or not. It appears in evidence that no such mortgage ever was filed or recorded, and, this being so, it was not valid as against Thompson's creditors. Lien Law, § 90, Laws N. Y. 1897, p. 536, c. 418. These horses were testified by some witnesses to be the best in the stable, and to be of the value of $1,500. Murray, however, values them lower. I think on all the testimony there can be no doubt that these horses were worth at least $1,200, and it consequently follows that Mr. Murray is indebted to the trustee in bankruptcy in this further amount of $1,200.

The trustee in bankruptcy further shows, by the examination of the bankrupt's bookkeeper, that the bankrupt's books show, and that the fact was, that between the date of the chattel mortgages, January 21, 1899, and the date of the assignment, horses, harness, and other stable property had been purchased by the bankrupt at a cost of, and of the value of, $1,930.50. Most of this value is represented by horses, of which there are 13, and it is significant that in the administration of the estate no attempt was made by Mr. Murray to separate these horses and property—which under no theory could be deemed subject to either of the mortgages—from that claimed to be so subject. Although it might well be claimed that this property should be separately accounted for, and that it, or so much of it as had not been destroyed or disposed of between January 21, 1899, and the date of the assignment (and none was shown to have been), should be surrendered to the trustee, still, following the course I have pursued all along, of taking Mr. Murray's testimony as correct as to the amount and kind of property coming into his hands, I will assume here that this property formed part of that sold or disposed of as testified to by him.

Coming, now, to the trustee's objection to the assignee's account as filed, as above set forth, I have concluded that the item of $393.75 should be allowed, as it represents claims which would be entitled to priority of payment out of the assets by the trustee in bankruptcy. The amount of $8.52, petty disbursements, is also allowed.

The trustee objects to the payment for gas and for labor subsequent to the assignment, upon the ground that these were used and employed substantially to enable Mr. Murray to collect his own debt at the expense of the general creditors. I think it must be admitted that, on the accounting so far made by Mr. Murray, this contention is unanswerable. If, on the other hand, Mr. Murray should account to the trustee in the manner herein directed, then these payments will probably reasonably have inured to the

benefit of all of the creditors, and should be allowed. I will therefore allow these two items, aggregating $239.85, provided the assignee account to the trustee in the manner herein directed.

The only other two items objected to by the trustee are $250 counsel fee to the assignee's counsel, and $20 premium on his bond as assignee. These payments I consider in substantially the same category as the last. If the services of counsel were rendered in advising the assignee as a representative of, and for the benefit of, all the creditors, the charge is reasonable, and should be allowed. If, as urged by the trustee, the services were rendered in advising the assignee how he could, under legal guise, take property rightfully belonging to the general creditors, then surely it should not be allowed out of the estate. Similar principles would apply to the premium on the bond. The same order may be made respecting this amount of $270 as that made with respect to the last item of $239.85.

The trustee also asks that the referee certify to the court that Mr. Murray is in contempt for delay and failure to produce all his assignor's books, papers, and documents to the trustee, as directed by the order of the judge first above set forth. The assignee was so directed, not only by this order, but also in the course of the proceedings by the referee. It appears that many of his books and papers he did deliver to the trustee, although it was done with some delay. It does appear further, however, that the checkbook and cashbook and notebook used by the bankrupt at the time of the assignment are not produced, as neither is the bankrupt's ledger No. 5, which is said to contain an account of the bankrupt with Hincks & Johnston, and also with Murray, although these books have been especially asked for by the trustee. Thompson testifies, as does Baudry, Thompson's bookkeeper, that all these books were turned over to Mr. Murray, and Mr. Murray does not deny this. His only explanation is that he gave directions to have these books taken to the office of his counsel for production to the trustee, and that he does not know what has become of the particular books wanted. The books asked for should certainly be produced to the trustee. They particularly concern the transactions under investigation, and are indispensable to a thorough examination of them. Mr. Murray disclaims any intention to disobey the order of the court, and I would fain believe that this is in truth his feeling. I will not, therefore, for the present, certify a contempt to the judge, provided that Mr. Murray forthwith account to the trustee as herein ·directed, and also produce before the referee further evidence tending to show with particularity how and where these books have disappeared, and why they have not been produced to the trustee in bankruptcy. Failing in this, the trustee may renew his motion for a certificate in contempt.

The assignee's attorney, on the argument, raises the question of the jurisdiction of the court, presumably under the decision of Bardes v. Bank, 178 U. S. 524, 20 Sup. Ct. 1000, 44 L. Ed. 1175, 4 Am. Bankr. Rep. 163. I think, however, that the rule in Bardes v. Bank is not applicable to this case, and that, especially in view of the later decision of the Supreme Court in Bryan v. Bernheimer, 181 U. S. 188, 21 Sup. Ct. 557, 45 L. Ed. 814, 5 Am. Bankr. Rep. 623, there can be no doubt of the jurisdiction of this court on this application.

An order may be submitted in accordance herewith.

Thomas D. Rambaut and Edward H. Wilson, for trustee.
Wm. J. Fanning, for assignee.

HOLT, District Judge. I think that the referee had jurisdiction to make the order (Bryan v. Bernheimer, 181 U. S. 188, 21 Sup. Ct. 557, 45 L. Ed. 814); that the petition and order to examine Murray was substantially a re-opening of the proceedings on the accounting; that the motion at the close of Murray's examination gave him due notice of the claims against him which were passed on by the referee, and that he had a fair opportunity to give evidence and be heard on the claims made against him; that Murray went into possession of the bankrupt's

property and held it as assignee for the benefit of creditors, and not as mortgagee in possession; that Hincks & Johnston took the carriages covered by their mortgage in payment of their claim; that they could not transfer to any other creditor a lien on the rest of the property mortgaged; that therefore Murray held all the rest of the property, not covered by his first two mortgages, as assignee, and was properly charged with its value by the referee; that he was also liable as assignee for the value of all the property purchased by the bankrupt after executing the Hincks & Johnston mortgage, except the eight horses mortgaged to O'Donnell; that the mortgage to O'Donnell, although not filed, was valid as to the parties and Murray as assignee; and that therefore Murray was justified in delivering said eight horses to O'Donnell.

My conclusion is that the referee's order should be modified by deducting $1,200, the value of the eight horses delivered to O'Donnell, from the sum of $6,036.85, the amount directed to be paid by the assignee to the trustee, and that the order in other respects should be affirmed.