**In re JENSEN–FARLEY PICTURES, INC., Debtor.**

**Bankruptcy No. 83A–03391.**

United States Bankruptcy Court,
D. Utah, C.D.

Feb. 14, 1985.

Gary E. Jubber, Fabian & Clendenin, Salt Lake City, Utah, for debtor.

Carolyn Montgomery, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for Arthur Young & Co.

William G. Fowler, Salt Lake City, Utah, for the unsecured creditors' committee.

## MEMORANDUM OPINION

JOHN H. ALLEN, Bankruptcy Judge.

### CASE SUMMARY

This matter is before the Court on the verified applications for allowance of inter-

im compensation filed by co-counsel for the creditors' committee, the accountant for the debtor, and the accountant for the creditors' committee. The Court is called upon to decide (1) whether compensation for pre-petition services rendered by the attorney for an unofficial creditors' committee and the accountant for the debtor is allowable as an administrative expense of the Chapter 11 case; (2) whether professional persons employed pursuant to the authorization of this Court are limited to hourly rates charged by professionals in the Salt Lake City, Utah area; (3) whether the accountant for the creditors' committee represents an interest adverse to the debtor's estate such as to warrant denial of all compensation sought; and (4) whether the fees and costs sought are otherwise allowable.

## FACTUAL AND PROCEDURAL BACKGROUND

The debtor, Jensen-Farley Pictures, Inc., is a Utah corporation engaged in the business of producing and distributing motion pictures. In the Fall of 1983, the debtor's financial situation had deteriorated to a critical point. On October 12, 1983, the debtor's principals and financial advisors held a meeting at the debtor's New York City office with its largest creditors to seek their cooperation while it attempted to restructure its business. The creditors present organized themselves into an unofficial committee and employed Teitelbaum & Gamberg, P.C., a New York City law firm, as its counsel. The debtor paid Teitelbaum & Gamberg a retainer of $10,000.[1]

The debtor requested that the committee recommend a temporary moratorium on debt collection by individual creditors while it attempted a nonbankruptcy workout. Members were informed that the Salt Lake City, Utah, law firm of Fabian & Clendenin had been retained and would file a Chapter 11 petition if necessary in order to forestall creditor action.

At the same time as the meeting with its largest creditors, the debtor employed Arthur Young & Company, certified public accountants, to conduct an audit of its books and records, and an expanded review of its assets and liabilities in connection with the effort to restructure and reorganize the business.[2] As a concession for recommending the moratorium, the debtor agreed to furnish the committee with all information produced by Arthur Young & Company. To this end the debtor instructed Arthur Young & Company to communicate and work directly with the unofficial committee.

During the uneasy truce with its creditors, the committee and Teitelbaum & Gamberg were involved in negotiations concerning possible acquisitions of or mergers with the debtor. The debtor's efforts toward accomplishing a nonbankruptcy workout were unsuccessful. On December 30, 1983, the debtor filed a voluntary petition for relief under Chapter 11.[3]

On January 3, 1984, upon application of the unofficial creditors' committee, the Court appointed a 16-member creditors' committee, consisting exclusively of the former members of the unofficial committee. On January 3, 1984, the Court also approved the employment of Teitelbaum & Gamberg and Roe & Fowler as co-counsel for the creditors' committee and Ernst & Whinney as its accountant. On January 5,

---

1. Teitelbaum & Gamberg's First Verified Application for Allowance of Compensation and Reimbursement of Expenses does not disclose the date upon which the $10,000 payment was made.

2. The first Verified Application for Allowance of Compensation and Reimbursement of Expenses by Arthur Young & Company shows that the firm actually commenced performing accounting services on October 20, 1983.

3. For every Chapter 11 filed by a commercial business entity, there are numerous nonbankruptcy workouts. *See Hearings on S.2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* at 582 (1978) (statement of Robert J. Grimmig, Senior Vice President, Chemical Bank).

1984, the Court approved the employment of Arthur Young & Company as accountant for the debtor. An Examiner was appointed in the case on April 24, 1984, to "investigate the acts, conduct assets, liabilities, and financial condition of the debtor, the operation of the debtor's business, and the desirability of the continuation of such business, and any other matter relevant to the case or to the formulation of a plan." On October 24, 1984, the Examiner filed a report with the Court based on his investigation of the business and financial affairs of the debtor. The Examiner's report concluded that "the continuation of the debtor's business is impossible." [4]

Verified applications for interim compensation and reimbursement of cases were filed by Teitelbaum & Gamberg, Roe & Fowler, Arthur Young & Company, and Ernst & Whinney in May, 1984.[5] In support of their application each applicant attached an itemization setting out the time spent and services rendered. After notice to parties in interest, the Court received an objection from the debtor to the applications of Teitelbaum & Gamberg, Ernst & Whinney, and Arthur Young & Company. The debtor objects (1) to the allowance of compensation for prepetition services performed by Teitelbaum & Gamberg and Arthur Young & Company; (2) to compensation to Teitelbaum & Gamberg, Ernst & Whinney and Arthur Young & Company in excess of the rates charged in the Salt Lake City area; (3) to the allowance of *any* fees to Ernst & Whinney upon the grounds that the accounting firm represents an interest adverse to the estate; (4) to the reasonableness of the fees sought by Teitelbaum & Gamberg, even when applying New York rates; (4) to the allowance of full compensation to attorneys for routine services such as telephone calls and correspondence; (6) to allowance for duplicative services by attorneys and accountants; (7) to the "overuse" of senior counsel by Teitelbaum & Gamberg; and (8) to the allowance of certain "overhead" items as reimbursable expenses.

On June 14, 1984, a hearing was held to consider the four applications. No evidence was presented in support of or against the applications but the Court heard the arguments of counsel. The Court took the matter under advisement and invited the parties to submit simultaneous memoranda. The Court has reviewed the applications and documentary evidence of record, the pleadings and papers on file herein, the memoranda of the parties in support of their respective positions, the transcript of oral argument, and the pertinent statutes, rules and case authorities, and now renders its decision.

## DISCUSSION

### Prepetition Attorneys' and Accountants' Fees

The majority of the services for which compensation is sought by Teitelbaum & Gamberg, P.C., co-counsel for the creditors' committee, and Arthur Young & Company, accountant for the debtor, was performed prior to the commencement of the Chapter 11 case. Nonetheless, these applicants contend that their prepetition fees may be allowed as an administrative expense under

---

**4.** Report of W. LaMonte Robison, Examiner, at ¶ 19, p. 11 (Oct. 24, 1984).

**5.** The applications are summarized as follows:

| Applicant | Period | Fees Sought | Costs Sought |
|---|---|---|---|
| Ernst & Whinney | Jan. 3, 1984–May 3, 1984 | $18,905.00 | $1,519.00 |
| Roe & Fowler | Dec. 28, 1983–Apr. 30, 1984 | $15,885.50 | $2,347.84 |
| Teitelbaum & Gamberg | Sept. 20, 1983–Apr. 27, 1984 | $59,473.25 | $ 772.19 |
| Arthur Young & Company | Oct. 16, 1983–Apr. 18, 1984 | $79,718.00 | $4,441.00 |

11 U.S.C. § 503(b)(3) and (4).[6] To understand this provision it is necessary to consider administrative expenses in their historical context.

### The Language and Legislative History of Section 503 and the "Substantial Contribution" Test

Section 503 deals with administrative expenses allowable in a bankruptcy case. It describes six kinds of claims that are entitled to a first priority status under Section 507(a). Section 503(b)(3) and (4) permits the bankruptcy court to allow as an administrative expense reasonable compensation for professional services rendered by an attorney or accountant employed by a creditor, to the extent the expense falls within the guides described in that section. Section 503(b)(3) and (4) read as follows:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under Section 502(f) of this title, including—

> \* \* \* \* \* \*

> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

> (A) a creditor that files a petition under Section 303 of this title;

> (B) a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;

> (C) a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor;

> (D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title; or

> (E) a custodian superseded under section 543 of this title, and compensation for the services of such custodian;

> (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

Subsection (b) is derived mainly from section 64a(1) of the Bankruptcy Act, with some changes. S.Rep. No. 95–989, 95th Cong., 2d Sess. 66 (1978), 1978 U.S.Code Cong. & Admin.News, p. 5787, 5852. The language is relatively clear; it permits certain creditors, indenture trustees, or unofficial committees to receive as an administrative expense their actual, necessary expenses for a "substantial contribution" to a case under Chapter 9 or Chapter 11. *See* 3 COLLIER ON BANKRUPTCY ¶ 503.04, at 503–36 (15th ed. 1984). Subsection (b) also contemplates that certain qualifying expenses incurred prepetition receive an administrative priority. *See* 11 U.S.C. § 503(b)(3)(E); *Matter of Pride Foods Inc.*, 22 B.R. 356, 9 B.C.D. 480, 6 C.B.C.2d 1412 (Bkrtcy.D.Neb.1982); 124 Cong.Rec. H11094–95 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards); 124 Cong.Rec. S17411 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini).

■ The legislative history of Section 503(b) indicates that Congress intended to adhere to the "direct benefit" rule of decisions under Sections 242 and 243 of the Bankruptcy Act, without the requirement of a confirmed plan, and, with respect to superseded custodianships, to the "equitable benefit" doctrine of *Randolph v. Scruggs*, 190 U.S. 533, 23 S.Ct. 710, 47 L.Ed. 1165 (1903). *See* 124 Cong.Rec. H11095 (daily ed. Sept. 28, 1978) (remarks

---

**6.** The question of allowance of prepetition fees and costs as an administrative expense seems to have been raised in a variety of contexts since the enactment of the 1867 Bankruptcy Act. *In re Chase*, 124 Fed. 753, 754 (1st Cir.1903). *See* text following footnote 7, *infra*.

of Representative Edwards); 124 Cong. Rec. S17411 (daily ed. Oct. 6, 1978) (remarks of Senator DeConcini).[7]

*(1) The "Direct Benefit" Rule.* Turning first to the issue of whether these applicants' services made a "substantial contribution" to the Chapter 11 case, the Court notes that the phrase is derived from Sections 242 and 243 of the former Bankruptcy Act, 11 U.S.C. §§ 642, 643 (repealed). H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 355 (1977), 1978 U.S.Code Cong. & Admin.News, p. 6311; S.Rep. No. 95–989, 95th Cong., 2d Sess. 67 (1978), 1978 U.S. Code Cong. & Admin.News, pp. 5852–53. "It does not require a contribution that leads to confirmation of a plan, for in many cases, it will be a substantial contribution if the person involved uncovers facts that would lead to a denial of confirmation, such as fraud in connection with the case." *Id.* Sections 242 and 243 were implemented by former Bankruptcy Rule 10–215(c)(1)(B), which enabled the bankruptcy court to make allowances of reasonable compensation and reimbursement of expenses for services which (1) were beneficial in the administration of the estate; (2) contributed to a plan which was approved or to the approval of a plan whether or not such plan was confirmed; (3) contributed to a plan which was confirmed or to the confirmation of a plan; or (4) were rendered in opposing a plan, the confirmation of which was refused. The principal test was the benefit to the debtor's estate. *See* 6A COLLIER ON BANKRUPTCY ¶ 13.02, at 541–42 (14th ed. 1977).

Under Section 77B of the Bankruptcy Act, 11 U.S.C. § 207, fees could be awarded for prepetition services of committees and professionals employed by committees where the services directly benefited the reorganization. *In re Ulen & Co.,* 130 F.2d 303 (2d Cir.1942). *See In re Detroit Inter-*

*national Bridge Co.,* 111 F.2d 235 (6th Cir.1940); *Stark v. Woods Brothers Corporation,* 109 F.2d 969 (8th Cir.1940); *Sullivan & Cromwell v. Colorado Fuel & Iron Co.,* 96 F.2d 219 (10th Cir.1938); *In re Memphis Street Railway Company,* 86 F.2d 891 (6th Cir.1936); *In re Tudor Gables Building Corporation,* 83 F.2d 871 (7th Cir.1936); *In re National Lock Co.,* 82 F.2d 600 (7th Cir.), *cert. denied, National Lock Co. v. Rosengard,* 299 U.S. 562, 57 S.Ct. 25, 81 L.Ed. 414 (1936); *In re United Cigar Stores Co. of America,* 21 F.Supp. 869 (S.D.N.Y.1937); *In re Memphis Street Railway Company,* 11 F.Supp. 682 (W.D. Tenn.1935), *rev'd,* 86 F.2d 891 (6th Cir. 1936). Cases under Chapter X of the Chandler Act,[8] which replaced Section 77B, adhered to the "direct benefit" rule of earlier decisions. *See e.g., Finn v. Childs Co.,* 181 F.2d 431 (2d Cir.1950); *In re Mount Forest Fur Farms of America,* 157 F.2d 640 (6th Cir.1946); *In re Realty Associates Securities Corporation,* 156 F.2d 480 (2d Cir. 1946); *In re Ulen & Co., supra,* 130 F.2d at 303; *In re Mortgage Guarantee Co.,* 40 F.Supp. 226 (D.Md.1941). *See generally* 6A COLLIER ON BANKRUPTCY ¶ 13.06, at 582–83 (14th ed. 1977).

In *In re Buildings Development Co.,* 98 F.2d 844 (7th Cir.1938), a bondholders protective committee had been formed four and a half years prior to the debtor filing a petition for reorganization under Section 77B of the Bankruptcy Act. The committee sought compensation for prepetition services performed on behalf of its members. The Court found that the services were for the benefit of members of the committee and any benefit to the estate or other creditors was incidental. In disallowing the claim for compensation, the Court reasoned as follows:

The services of the committee prior to the institution of reorganization proceed-

---

**7.** Benefit to the estate or "results obtained" has been de-emphasized for allowances under Section 330, but it lies at the heart of awards under Section 503(b)(3)(D) and (4) for making a "substantial contribution" to the case. *See In re Grist,* unpublished memorandum opinion at 3–4 (Bkrtcy.D.Utah, Aug. 2, 1984) (Allen, J.).

**8.** The Chandler Act was passed by Congress on June 22, 1938, and became effective on September 22, 1938. Pub.L. 696, 52 Stat. 840 (1938).

ings did not contemplate a reorganization and were performed for the sole purpose of protecting the claims of holders of first mortgage bonds who were parties to the deposit agreement. The decisions establish that services rendered prior to the institution of a reorganization proceeding may be compensated as a part of the cost of reorganization, if they are in fact of value in the formulation and adoption of the plan. But when a committee is organized for the purpose of protecting the interest solely of a designated group of creditors and when all of the steps taken by this committee are taken for the purpose of protecting the interest of the designated class of creditors, and when there is no intention to aid the debtor directly by preserving its property for purposes of reorganization for the benefit of the debtor as well as creditors, such services cannot be said to be rendered in connection with a subsequent reorganization proceeding and plan simply because such services prevented, or helped to prevent, the debtor from losing the only assets out of which such creditors might obtain payment.

In the instant case the services performed by the committee prior to the institution of the reorganization proceedings were not rendered in anticipation of a reorganization; and the evidence fails to disclose that such services contributed to the formulation and adoption of the plan which was afterwards submitted by the committee. No doubt the services helped to keep legal title to its property in the debtor; but there was no intention to accomplish this result in order to preserve assets as the basis of a reorganization for the benefit of the debtor as well as for creditors.

*Id.* at 845–46 (footnote omitted).

In *Sullivan & Cromwell v. Colorado Fuel & Iron Co., supra,* 96 F.2d at 219, receivership proceedings were instituted against the debtor on August 1, 1933. In June of that year, a committee was formed of creditors holding bonds secured by a first lien on part of the structures and equipment of the debtor and on a large portion of its mining properties. The committee retained the law firm of Sullivan & Cromwell shortly after formation. On August 1, 1934, the debtor filed a petition for reorganization under Section 77B of the Bankruptcy Act. The committee and its counsel did not participate actively in the preparation of a plan of reorganization but asserted that any plan would have to recognize the priority of the liens of the fuel bonds. A plan of reorganization proposed by the debtors was confirmed in April, 1936, which recognized the superior rights of the fuel bondholders. Sullivan & Cromwell sought an allowance of $12,000 as compensation for services as counsel to the bondholders' committee during both the equity receivership proceeding and the bankruptcy case. The Court allowed Sullivan & Cromwell $2,500 in fees upon finding that their services were not rendered in connection with the plan and reorganization. On appeal, the Tenth Circuit affirmed, setting forth guidelines for allowance of prepetition expenses under Section 77B, as follows:

The statute is broad in scope and does not limit the compensation authorized by its terms to services rendered after the institution of the reorganization proceeding. It is common knowledge that the affairs of a debtridden corporation are sometimes so complicated that skill, patience, and extended consideration of many factors covering a long period of time are required to effect a fair and equitable plan of reorganization. It frequently is feasible and expedient to work out the plan before the proceeding is filed; and compensation may be awarded for services rendered before as well as those rendered after the proceeding is actually instituted if they had a direct and proximate relation to the formation of the plan, were valuable, and were in the interest of the debtor.

*Id.* at 221–22.

In *In re Ulen & Co., supra,* 130 F.2d at 303, counsel for an unofficial committee of debenture holders formed during the pendency of the debtor's Chapter X case sought

compensation for services rendered and reimbursement for costs expended following dismissal of the Chapter XI case and the commencement of a Chapter X case. The services for which compensation was sought related to negotiating a plan of arrangement under Chapter X. The Second Circuit recognized that allowances under Sections 242 and 243 were not exclusively limited to services and expenses occurring after the date of filing. But, as with the predecessor statute, Section 77B, the services must have been in furtherance of the plan ultimately adopted or "closely beneficial to the estate." *Id.* at 304. The Second Circuit found that the plan of reorganization differed markedly from the plan of arrangement negotiated by the committee's counsel, and the services rendered were not of direct benefit to the estate. Accordingly, fees and costs were denied in their entirety.

In *Finn v. Childs Co., supra,* 181 F.2d at 431, the court considered the legal basis under the Bankruptcy Act for an award of fees for prepetition services performed by a committee of debenture holders and its counsel. The committee was formed eleven months before the debtor filed a voluntary petition for reorganization under Chapter X. The prepetition services for which compensation was sought consisted chiefly of urging debenture holders to oppose a nonbankruptcy workout proposed by the debtor. The Second Circuit found that such services were not of benefit to the estate and only remotely related to the plan of reorganization. Addressing the issue of prepetition services, the court stated:

But we think the issue should be faced more directly; shortly stated, the very tenuous statutory basis for any allowance does not seem to us to justify awards for uncertain and somewhat problematical benefits thus conferred on the administration of an estate before it has begun. The difficulty is in seeing where much of any line can be drawn to reduce the potential contribution for prior activities during the always-occurring prior period of financial stress. Activities supporting the management will be beneficial as aimed at avoiding the disaster of bankruptcy; while activities opposing its excesses will be beneficial as hastening the curative and cleansing course of reorganization. The cases emphasize that when such allowances are made they must be for work which "directly contributes" to the reorganization; thus we have held that compensation is not allowable from the estate "for the work of the attorneys in conserving the debtor's assets" as well as in proposing an arrangement differing from the reorganization finally effected.... To have this direct connection it would seem that the services must not only be ultimately beneficial in some clearly observable way, but also have been directed toward the specific rehabilitation of the debtor which actually took place. Chance and unwitting action, or activities a year or so earlier to control the course of creditor pressure upon the debtor, would seem clearly outside the narrow limits of the precedents, even if these in turn do go somewhat beyond the literal statutory language.

*Id.* at 439–40 (footnote and citations omitted).

The phrase "substantial contribution" actually appears in Section 4–403 of the bankruptcy statute proposed by the Commission on the Bankruptcy Laws of the United States. Section 4–403 states in pertinent part:

(a) Administrative Claims. An administrative claim for any of the following expenses shall be allowed to the extent the expense is necessary and reasonable:

\* \* \* \* \* \*

(8) compensation for services, representing a substantial contribution to a confirmed plan in a Chapter VII case, rendered by an attorney or accountant to an indenture trustee, a creditor, an equity security holder, or a committee representing creditors or equity security holders not appointed pursuant to Section 7–101;

(9) expense, representing a substantial contribution to a confirmed plan in a Chapter VII case, not included in clause (8), incurred by a creditor, equity security holder, or a committee representing creditors or equity security holders not appointed pursuant to Section 7–101....

Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 93–137, 93d Cong., 1st Sess., Pt. II at 99 (1973). Its counterpart in the legislation proposed by the National Conference of Bankruptcy Judges also used the phrase "substantial contribution" and would also have limited such administrative claims to cases in which a plan of reorganization was confirmed. *See Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. of the Judiciary, 94th Cong, 1st & 2d Sess., Ser. No. 27, App. I, pp. 130–31 (1975).*

■ The requirement that the services or expense must have substantially contributed to a confirmed plan was ultimately dropped by Congress in enacting Section 503(b). *See* S.Rep. No. 95–989, 95th Cong., 2d Sess. 67 (1978), U.S.Code Cong. & Admin.News 1978, p. 5852. But otherwise, the "direct benefit" rule of the foregoing cases remains the touchstone in a "substantial contribution" analysis. The appropriate test under Section 503(b) is whether the services substantially contributed to a successful result, that is, an actual and demonstrable benefit to the debtor's estate, the creditors, and, to the extent relevant, the stockholders. *See In re United Puerto Rican Food Corp.,* 41 B.R. 565, 574, Bankr.L.Rep. (CCH) ¶ 69,913 (Bkrtcy.E.D. N.Y.1984); *In re Calumet Realty Co.,* 34 B.R. 922, 11 B.C.D. 361, Bankr.L.Rep. (CCH) ¶ 69,489 (Bkrtcy.E.D.Pa.1983); *In re J.V. Knitling Services, Inc.,* 22 B.R. 543, 545 (Bkrtcy.S.D.Fla.1982); *In re Richton International Corp.,* 15 B.R. 854, Bankr.L. Rep. (CCH) ¶ 68,489, 5 C.B.C.2d 1019 (Bkrtcy.S.D.N.Y.1981). W. Norton, 1

NORTON BANKRUPTCY LAW AND PRACTICE § 12.32, at pt.12—pg.49 (1981); 3 COLLIER ON BANKRUPTCY ¶ 503.04, at 503–38 (15th ed.1984). The professional services of Teitelbaum & Gamberg were rendered on behalf of a committee of creditors attempting to fashion a nonbankruptcy workout. The committee was obviously unsuccessful in its endeavor. Moreover, this applicant is unable to point to any direct benefit to the debtor's estate arising out of the prepetition services. It is the opinion of this Court that participation in negotiating a nonbankruptcy workout will not give rise to a claim for compensation from the estate. This is a service for which attorneys must ordinarily look to their own clients for payment.

■ *(2) The "Equitable Benefit" Doctrine.* If a bankruptcy case supersedes a general assignment for the benefit of creditors[9] or a receivership the Bankruptcy Code permits expenses incurred in those proceedings to enjoy an administrative priority. *See* 11 U.S.C. § 503(b)(3)(E); 11 U.S.C. § 543(c)(2). In their joint statement, the floor managers explained that "[s]ection 503(b)(3)(E) codifies present law in cases such as *Randolph v. Scruggs,* 190 U.S. 533, 23 S.Ct. 710, 47 L.Ed. 1165, which accords administrative expense status to services rendered by a prepetition custodian *or other party* to the extent such services actually benefit the estate." 124 Cong. Rec. H11095 (daily ed. Sept. 29, 1978) (remarks of Representative Edwards); 124 Cong.Rec. S17411 (daily ed. Oct. 6, 1978) (remarks of Senator DeConcini). (Emphasis added). It is argued, with some cogency, that this provision authorizes the bankruptcy court to make an allowance of prepetition attorneys' fees incurred on behalf of the unofficial creditors' committee as an administrative expense. It is therefore not surprising that one bankruptcy court has interpreted the words "or other party" in the statement of the floor managers to

---

9. A general assignment involves a voluntary transfer by the debtor of his property to an assignee in trust, for the purpose of pro-rata distribution of the estate to creditors. *See* Treister, "The Effect of Bankruptcy on the Administration Expenses of a Superseded General Assignment," 17 Bus.Law. 332 (1962). *See also* Utah Code Ann. §§ 6–1–1 to 6–1–20 (Repl.1982).

include a committee of creditors. *See In re Med General, Inc.,* 17 B.R. 13, 14 (Bkrtcy. D.Minn.1981) (court saw no reason to distinguish between beneficial results of committee's prepetition activity and its postpetition activity).

Prior to the Supreme Court's decision in *Randolph v. Scruggs, supra,* 190 U.S. at 533, 23 S.Ct. at 710, the courts were split on the issue of whether an assignee and professionals employed by him under a general assignment for the benefit of creditors were entitled to their expenses as an administrative priority in a superseding bankruptcy case. *See generally,* 3A COLLIER ON BANKRUPTCY ¶ 62.32, at 1617 (14th ed.1975). In *Randolph,* an assignee was appointed by the Langstaff Hardware Company under the general assignment law of Tennessee on August 13, 1900. The deed of assignment conveyed all of the debtor's corporate property to the assignee for pro-rata distribution to its creditors and provided that the assignee should pay reasonable attorneys' fees for preparing the deed and for advising and counseling the assignee in the course of his administration of the trust. Within four months of the assignment, the assignor (debtor), upon the filing of an involuntary petition, was adjudged a bankrupt. The deed of assignment was subsequently set aside by the bankruptcy trustee, who took possession of the assets of the bankrupt. The attorney for the assignee filed a claim against the estate for professional services rendered in advising and counseling the assignee, preparing the deed of assignment, defending a suit in state court to have the business of the debtor wound up, and for resisting the involuntary petition. The referee found and certified that the services had been rendered as claimed, and were reasonable and worth the amount claimed, but that they were not allowable as an administrative expense and did not otherwise constitute a lien on property of the estate. He allowed fees for preparing the general assignment, but disallowed the balance of the fees claimed. The district court affirmed, and the Sixth Circuit certified the case to the Supreme Court. The Supreme Court, in a unanimous opinion written by Justice Holmes, announced the principle that costs of a superseded assignment for the benefit of creditors, including attorneys' fees for representing the assignee, to the extent they tend to the preservation or benefit of the bankruptcy estate, were entitled to first payment out of the estate as an equitable lien.[10]

The equitable benefit doctrine of *Randolph v. Scruggs* permitted assignees and others, usually receivers, to receive such prepetition expenses as were reasonably incurred in the care and preservation of assets, which inured to the benefit of the bankruptcy estate. *In re Armstrong Glass Company, Inc.,* 502 F.2d 159 (6th Cir.1974); *Fine v. Weinberg,* 384 F.2d 471 (4th Cir.1967); *In re Marks,* 267 F.2d 108 (7th Cir.1959); *In re Paramount Merrick, Inc.,* 252 F.2d 482 (2d Cir.1958); *Goldie v. Cox,* 130 F.2d 690 (8th Cir.1942); *Chase Bag Co. v. Schouman,* 129 F.2d 247 (6th Cir.1942); *First National Bank in Albuquerque v. Robinson,* 107 F.2d 50 (10th Cir.1939); *In re James Butler Grocery Co.,* 100 F.2d 376, 378 (2d Cir.1938); *In re Cohen,* 64 F.2d 103 (2d Cir.1933); *In re White,* 58 F.2d 203 (2d Cir.1932); *In re Jack Stolkin, Inc.,* 42 F.2d 829 (2d Cir. 1930); *Petition of Andrew Dutton Co.,* 10

---

**10.** While most courts and practitioners apparently interpreted *Randolph v. Scruggs* as allowing the assignee's costs as an administrative claim, the Supreme Court seems to have considered them a lien, *i.e.,* a secured claim against specific property. For a thoughtful pre-Code discussion of the equitable lien theory of *Randolph v. Scruggs, see* Treister, *supra,* note 9, at 335–39. *Cf. Paine v. Archer,* 233 Fed. 259 (9th Cir.1916) (in a case where the assets of the estate were insufficient to pay the expenses of administration of the bankruptcy case and the state court receiver's fees, the court applied the *Randolph v. Scruggs* lien theory and ordered the receiver paid in full). Section 503(b)(3)(E) eliminates the lien theory of reimbursement by according a first priority administrative expense status to services rendered by a prepetition custodian to the extent such services actually benefited the estate. *See* 124 Cong.Rec. H11095 (daily ed. Sept. 28, 1978) (remarks of Representative Edwards); 124 Cong.Rec. S17411 (daily ed. Oct. 6, 1978) (remarks of Senator DeConcini).

F.2d 502 (1st Cir.1926); *Gardner v. Gleason*, 259 Fed. 755 (1st Cir.1918); *Hume v. Myers*, 242 F. 827 (4th Cir.1917); *Paine v. Archer*, 233 Fed. 259 (9th Cir.1917); *Bramble v. Brett*, 230 Fed. 385 (8th Cir.1916); *In re Stewart*, 179 Fed. 222 (6th Cir.1910); *In re Zier & Co.*, 142 Fed. 102 (7th Cir.1905); *In re Summers v. Abbott*, 122 Fed. 36 (8th Cir.1903); *Matter of Supreme Plastics, Inc.*, 8 B.R. 730 (N.D.Ill.1980); *In re Kosting*, 350 F.Supp. 1071 (D.Conn.1972); *In re Garrett Road Corp.*, 256 F.Supp. 709 (E.D. Pa.1966); *In re Washington Brewing Company*, 56 F.Supp. 998 (W.D.Pa.1944); *In re Garcia Sugars Corporation*, 49 F.Supp. 350 (S.D.N.Y.1943); *In re Moskowitz*, 25 F.Supp. 341 (E.D.N.Y.1938); *In re Owl Drug Co.*, 16 F.Supp. 139 (D.Nev. 1936), *aff'd sub nom. Cohn v. Edler*, 90 F.2d 823 (9th Cir.1937); *In re Pologe*, 13 F.Supp. 1010 (S.D.N.Y.1935); *In re Natural Dry Ginger Ale Corporation*, 9 F.Supp. 1003 (W.D.N.Y.1935); *In re Hacker*, 38 F.2d 100 (S.D.N.Y.1929); *In re Quemahoning Creek Coal Co.*, 15 F.2d 58 (W.D.Pa.1926); *In re South Bend Lumber Co.*, 2 F.2d 783 (W.D.Wash.1924); *In re A.J. Waterman Mfg. Co.*, 291 Fed. 589 (D.Me.1923); *In re Cooper*, 243 F. 797 (D.Mass.1919); *In re Sobol*, 230 Fed. 652 (S.D.N.Y.1915); *In re Weedman Stave Co.*, 199 Fed. 948 (E.D.Ark.1912); *In re Wentworth Lunch Co.*, 189 Fed. 831 (S.D.N.Y. 1911), *rev'd*, 191 Fed. 821 (2d Cir.1911); *In re Standard Fuller's Earth Co.*, 186 Fed. 578 (S.D.Ala.1911); *In re Congdon*, 129 Fed. 478 (D.Minn.1904); *In re Byerly*, 128 Fed. 637 (M.D.Pa.1904); *In re M. Zier & Co.*, 127 Fed. 399 (D.Ind.1904), *aff'd.*, 142 Fed. 102 (7th Cir.1905); *In re Orchid Island Hotels Inc.*, 18 B.R. 926 (Bkrtcy.D. Haw.1982); *In re Marichal-Agosto, Inc.*, 12 B.R. 891 (Bkrtcy.S.D.N.Y.1981); *Matter of Suf-City Trucking, Inc.*, 1 B.R. 135 (Bkrtcy.E.D.N.Y.1979).

The following prepetition expenses were accorded an administrative priority as tending to preserve and benefit the bankruptcy estate: (1) appraiser's fees;[11] (2) fire insurance premium;[12] (3) repairs, insurance, and taxes paid by the assignee;[13] (4) reimbursement of bills incurred by an assignee for electric lights;[14] (5) assignee's expenses of operating the debtor's business;[15] (6) premium on the assignee's bond;[16] (7) assignee's expenses of taking an inventory and recovering possession of and protecting assets after having been forcibly dispossessed by the debtor;[17] (8) assignee's expenses incurred in adjusting a fire insurance claim for destruction of property of the debtor;[18] and (9) warehouse storage expenses incurred by a sheriff pursuant to a prepetition levy in an attachment proceeding, which preserved the debtor's property for the benefit of creditors.[19]

In every case in which prepetition expenses were allowed, a demonstrable benefit to the estate was shown. The benefit was required to be substantial and courts carefully scrutinized such requests. *See Bass v. Quittner, Stutman & Treister*, 381 F.2d 54, 59 (9th Cir.1967). It should be borne in mind that the Supreme Court clearly stated in *Randolph v. Scruggs* that "[w]e are not prepared to go further than to allow compensation for services which were beneficial to the estate." 199 U.S. at 539, 23 S.Ct. at 713. Creditors, unlike assignees or receivers, are presumed to act primarily in their own interests, not for the benefit of the estate as a whole. *Matter of Supreme Plastics, Inc., supra*, 8 B.R. at

---

11. *In re Cooper*, 243 Fed. 797 (D.Mass.1917).

12. *In re South Bend Lumber Co.*, 2 F.2d 783 (W.D.Wash.1924).

13. *In re Stewart*, 179 Fed. 222 (6th Cir.1910).

14. *In re Pattee*, 143 Fed. 994 (D.Conn.1906).

15. *Bramble v. Brett*, 230 Fed. 385 (8th Cir.1916); *In re Karp*, 228 Fed. 798 (D.Mass.1915).

16. *In re Thompson*, 122 Fed. 174 (S.D.N.Y.1903), *aff'd*, 128 Fed. 575 (2d Cir.1904).

17. *Bramble v. Brett, supra*, note 15.

18. *In re Levitt*, 126 Fed. 889 (E.D.Wis.1903).

19. *In re Heller*, 176 Fed. 656 (E.D.N.Y.1910).

736. *See* 3A COLLIER ON BANKRUPT-CY ¶ 62.32[2], at 1621 (14th ed. 1975).

To the extent that the legislative history of Section 503(b) suggests that parties other than assignees, receivers, or trustees may receive compensation for beneficial prepetition services as a cost of administration,[20] the Court believes that Congress envisioned circumstances similar to those in *Petition of Andrew Dutton Co.*, 10 F.2d 502 (1st Cir.1926). In that case, the debtor, Cabel Upholstering Company, called a meeting of its creditors, and with their agreement transferred all of its property to one of the creditors, Andrew Dutton Company, to administer on behalf of all creditors. A creditors' committee was formed, with Dutton as its president. Dutton took possession of the assets and cared for them, incurring expenses and making expenditures. Subsequently, an involuntary petition was filed and Cabel Upholstering Company was adjudicated a bankrupt. Dutton petitioned for expenses incurred in preserving the debtor's property. The referee disallowed the request. The District Court for the District of Massachusetts affirmed on the ground that there had been no assignment to Dutton and fees for prepetition services were not otherwise allowable under Section 646 of the Bankruptcy Act. The First Circuit reversed, based upon the doctrine of *Randolph v. Scruggs*, holding that the fees incurred, to the extent they were beneficial to the bankruptcy estate or necessary for its preservation, were entitled to an administrative priority.

An official creditors' committee was denied an administrative claim for compensation for prepetition services in *In re Rollin Motors Co.*, 23 F.2d 110 (N.D.Ohio 1927). In that case the debtor called a meeting of its creditors to seek their cooperation in working out a solution to its financial problems. The committee worked with the officers of the company to devise a plan for payment of the debtor's obligations and to liquidate its assets. When bankruptcy intervened, the committee sought $7,518.54 as an administrative claim for its prepetition services. The district court affirmed the referee's determination that the claim was not of such a character as to be allowed against the estate. The district court noted that the creditors' committee did not take over, control, and operate or preserve the assets and business of the debtor in the manner of an assignee under an assignment for the benefit of creditors. The Court stated that the character of the committee's claim "is one for services performed which are incapable of admeasuring in terms of property or funds rescued, or made available for creditors generally," and, therefore, not entitled to allowance.

In *Bass v. Quittner, Stutman & Treister, supra*, 381 F.2d at 54, the Ninth Circuit denied compensation to attorneys for an unofficial creditors' committee for services rendered prior to an assignment for the benefit of creditors. In July, 1961, the debtor, McDaniel's Markets, met with a substantial portion of its creditors pursuant to a notice given to all of its creditors, to discuss its financial problems and an offer to purchase its assets. A committee of ten creditors was chosen at the meeting, and the committee selected Quittner, Stutman & Treister as its counsel. The law firm represented the committee in negotiations for a sale of the debtor's assets. In order to consummate the sale, it was necessary to make an assignment for the benefit of creditors. From the date of the assignment until an involuntary bankruptcy petition was filed against McDaniel's Markets, Quittner, Stutman & Treister gave legal assistance to both the committee and to the assignee relating to the implementation of the sale of the debtor's assets, certain

---

**20.** The phrase "or other person" contained in the statement of the floor managers refers only to the expenses and compensation of a superseded custodian under Section 503(b)(3)(E). The statement does not refer to Section 503(b)(3)(D) or (4). Since "custodian" is defined in Section 101(10) to mean a receiver, assignee or trustee charged with administering the debtor's property, the floor managers may have misspoke themselves. In *In re Med General, Inc., supra,* 17 B.R. at 14, relied on by Teitelbaum & Gamberg, the court does not appear to have noted that the floor managers' statement referred *only* to Section 503(b)(3)(E).

pending attachments, and problems with secured creditors and landlords. The referee disallowed all fees, both for services to the committee and for services to the assignee. The district court reversed and allowed all fees. The Ninth Circuit held that Quittner, Stutman & Treister was not entitled to an administrative expense allowance for services rendered to the unofficial committee for services prior to the date the assignment for the benefit of creditors was made. The Court stated that under the circumstances it should be presumed that the attorneys' services were meant to benefit the members of the unofficial committee, and "[u]nless it is clearly demonstrated that the services have actually conferred an unquestionable, measurable benefit upon all of the creditors, the [committee members] must bear the expense." *Id.* at 59. The Ninth Circuit remanded the case for a re-examination of the claim so as to determine whether any of the services rendered to the assignees were compensable from the estate.

### *Accounting Services Performed In Contemplation of Bankruptcy*

■ The explanation by Arthur Young & Company emphasizes that their services were performed in contemplation of the debtor's bankruptcy, and had they not been performed pre-filing, it would have been necessary to employ accountants to perform the same services during the bankruptcy case. (Tr. p. 6). Counsel's repeated assertions that the accounting services were rendered "in contemplation of bankruptcy" (*See* Tr. pp. 6, 7, 10), is not supported by any evidence. On the contrary, the evidence is adequate to establish that Arthur Young & Company was employed to perform routine accounting services, such as an audit of the debtor's books and the preparation of financial statements. *See* "Summary of Time for Unreimbursed Fees, October 1983 to December 31, 1983, in Connection with Providing Information to the Creditors Committee," annexed as Exhibit "A" to the First Verified Application for Allowance of Compensation and Reimbursement of Expenses by Arthur

Young & Company (May 11, 1984). The debtor and Arthur Young & Company may have contemplated some reorganization of the debtor's business and financial affairs, but bankruptcy was more of a threat to enforce the creditor moratorium than the underlying purpose for the accounting services. Arthur Young & Company suggests that prepetition accounting services rendered "in contemplation of bankruptcy" are allowable as an administrative expense pursuant to Section 329 of the Code. The argument that Section 329 affords a basis for awarding prepetition fees to the debtor's accountants is without merit. Section 329 provides:

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate, if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11 or 13 of this title; or

(2) the entity that made such payment.

Section 329 is derived in large part from Section 60d of the former Bankruptcy Act. Like its predecessor, Section 329 deals solely with the power of the bankruptcy court to review the reasonableness of attorneys' fees in order to protect both creditors and the debtor from overcharges. *Cf.* S.Rep. No. 147, 88th Cong., 1st Sess. (Apr. 23,

1963), 1963 U.S.Code Cong. & Admin.News, pp. 634, 635–36. "Payments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 329 (1977), 1978 U.S.Code Cong. & Admin. News, p. 6285. The phrase "in contemplation of bankruptcy," as it appeared in Section 60d of the Act, was interpreted by the Supreme Court to require an inquiry as to the debtor's motives. "[T]he controlling question is with respect to the state of mind of the debtor and whether the thought of bankruptcy was the impelling cause of the transaction." *Conrad, Rubin & Lesser v. Pender*, 289 U.S. 472, 477, 53 S.Ct. 703, 77 L.Ed. 1327 (1933). *See also Matter of Swartout*, 20 B.R. 102, 106, 9 B.C.D. 313 (Bkrtcy.S.D.Ohio 1982) (in order for services to be "in contemplation of bankruptcy," they should be influenced by, and a direct result of, the imminence of the debtor's petition filing). Thus, it is clear that applicant's reliance upon Section 329 is misplaced. The section applies only to the Court's power to reexamine fees paid by the debtor to his attorney on the eve of filing bankruptcy.

Under circumstances somewhat similar to those of the present case, accountant's fees for prebankruptcy services were denied an administrative priority in *In re Hansen & Tyler Auto Co.*, 283 Fed. 850 (N.D.Iowa 1922). In that case the debtor had employed an accounting firm to audit its books at the request of a creditor while it was negotiating with creditors respecting its financial problems. An assignment for the benefit of creditors was made prior to completion of the audit. The audit was used by the assignee and by the trustee in a superseding bankruptcy. The accounting firm sought allowance of its fees as an administrative expense. The district court allowed the fees for work performed *after* the assignment as an administrative expense on the ground that the services were beneficial to the estate, and the balance as a general unsecured claim without priority.

■ Arthur Young & Company, although initially employed by the debtor, further argues that its prepetition fees are allowable under Section 503(b) because "[t]he financial information developed by [Arthur Young & Company] during the prepetition period inured to the benefit of the debtor, the estate, and the official creditors' committee appointed after the filing of the petition." Memorandum in Support of Application for Allowance of Compensation and Reimbursement of Expenses by Arthur Young and Company at 7 (June 25, 1984). Apparently recognizing the weakness of its Section 329 argument, Arthur Young & Company attempts to recharacterize the nature of its services by suggesting that because such services benefited the creditors' committee, they fall within Section 503(b)(3) and (4). It is clear that Arthur Young & Company was at all times employed by the debtor, not by the creditors' committee. The creditors' committee employed its own accountant, Ernst & Whinney. Accordingly, the Court finds no basis in law for allowance of an administrative claim to Arthur Young & Company for prepetition accounting services to the debtor. Therefore, the argument must fail.

*Local Versus National Billing Rates*

Teitelbaum & Gamberg is a New York law firm, with its offices in New York City. Mr. Teitelbaum's hourly billing rate, for which he charges other clients for similar matters, is $250.00. Arthur Young and Company is a national accounting firm, with offices in New York City, and elsewhere. Ernst & Whinney, accountants for the creditors' committee, is also a national accounting firm. The debtor contends that the New York billing rates for these attorneys and accountants are approximately twice those charged for similar services in Salt Lake City and must be reduced to the rates prevailing in the situs of the case. Debtor's Memorandum in Support of Objection to Fee Applications at 7 (June 25, 1984). This "community standard" approach enjoys some judicial support among the bankruptcy courts. *See e.g., In re*

*Werth,* 32 B.R. 442 (Bkrtcy.D.Colo.1983); *In re Nova Real Estate Investment Trust,* 25 B.R. 252, 9 B.C.D. 1310, 7 C.B.C.2d 994 (Bkrtcy.E.D.Va.1982); *Matter of Liberal Market, Inc.,* 24 B.R. 653, 9 B.C.D. 1216 (Bkrtcy.S.D.Ohio 1982); *In re International Coins & Currency, Inc.,* 23 B.R. 814, 9 B.C.D. 929 (Bankruptcy D.Vt.1982); *Matter of R.C. Sanders Technology Systems, Inc.,* 21 B.R. 40, 6 C.B.C. 40, 6 C.B.C.2d 150 (Bkrtcy.D.N.H.1982); *In re Sutherland,* 14 B.R. 55, 58, 4 C.B.C.2d 1580 (Bkrtcy.D.Vt. 1981).

A discussion of this controversial issue must begin with a brief look at six recent decisions, two from the United States Supreme Court, one from the Tenth Circuit, and three from bankruptcy courts.

In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court set forth the standards to be applied in making fee awards under the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988. The Court adopted the "lodestar" approach, with consideration of the *"Johnson* factors," [21] and urged parties requesting fees to exercise billing judgment and exclude "hours that are excessive, redundant, or otherwise unnecessary...." [22] The Supreme Court again considered the Civil Rights Attorney's Fees Award Act of 1976 in *Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In that case, the issue was whether Congress intended fee awards to nonprofit legal services organizations to be calculated at cost or at prevailing market rates. The Legal Aid Society of New York, a private nonprofit law office, commenced an action on behalf of Medicaid Recipients against the Commissioner of the New York State Department of Social Services seeking to enjoin the State's practice of terminating Medicaid benefits without due process. The district court granted judgment

for the plaintiffs and the Second Circuit affirmed. When the Legal Aid Society filed a request for reasonable attorneys' fees under 42 U.S.C. § 1988, the State argued that hourly rates for such fee awards should be based on cost rather than on prevailing market rates. The Supreme Court examined the legislative history of § 1988 and held that Congress intended that market rates would govern the allowance of attorneys' fees under the statute.

> The statute and legislative history establish that "reasonable fees" under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel.

*Id.,* 104 S.Ct. at 547 (footnote omitted).

The Tenth Circuit, in *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983), recently established further guidelines for the award of attorneys' fees under 42 U.S.C. § 1988. The Court held that absent "unusual circumstances" attorneys' fees would be based on rates prevailing "in the area in which the Court sits calculated as of the time the Court awards fees." *Id.* at 555.

In two recent bankruptcy decisions the issue before this Court was squarely presented. In *Matter of Baldwin United Corp.,* 36 B.R. 401 (Bkrtcy.S.D.Ohio 1984), the Court made an initial determination of fee standards to be applied prior to the filing of any applications for interim compensation. The Court considered whether professionals would be allowed to charge their customary hourly rates, or would be restricted to the prevailing hourly rates charged for like services in Cincinnati. The Court determined that to "limit fees to the rates charged by Cincinnati bankruptcy lawyers, merely because these cases happened to be filed in Cincinnati, would be a

---

**21.** *See* text following footnote 38, *infra.*

**22.** The Court stated: The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial

estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

position too capricious and parochial to withstand analysis under [Section] 330." *Id.* at 402. In *In re Wilson Foods Corp.,* 36 B.R. 317, 11 B.C.D. 722 (Bkrtcy.W.D. Okla.1984), the Court held that the "unusual circumstances" of the case warranted the allowance of professional compensation, including that sought by New York law firms, at rates normally charged by such professionals, rather than at the rates prevailing in the Oklahoma City area. The Court determined that "large and complex" Chapter 11 cases justify looking to a national, rather than a local, market in awarding fees. The court explained:

We also noted the legislative history of section 330(a) where the Congress expressed the view that "the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11." 124 CONG.REC. 32,–294 (1978). It appears contrary to this legislative intent to deny bankruptcy lawyers from other regions the normal fees charged clients when their expertise is needed in a complex proceeding in this venue. The better view is that the matters surrounding this estate do indeed warrant special consideration and constitute more unusual and unique circumstances than those faced by the court in *Ramos.* Accordingly, we find that outside counsel may charge rates normally charged clients in their respective regional areas for counsel time expended in these proceedings.

*Id.,* 36 B.R. at 321.

An earlier bankruptcy court decision agreed that the policy behind the enactment of Section 330 favored allowing out-of-state attorneys compensation at their regular billing rates. In *In re Atlas Automation, Inc.,* 27 B.R. 820, 10 B.C.D. 118, 8 C.B.C.2d 236 (Bkrtcy.E.D.Mich.1983), the bankruptcy court allowed counsel for the creditors' committee to receive compensation at his customary billing rate, which exceeded that of attorneys from the Flint, Michigan, area regularly practicing before the court. The court explained its reasoning as follows:

Consistent with the new position on fees must be the inference that more experienced practitioners with regional or metropolitan practices should be encouraged to accept appointments in cases filed in less populous communities. It is simply a fact that in a small community like Flint there are just not that many Ch. 11 cases filed involving substantial assets and liabilities; in this instance, Atlas Automation dwarfed almost all the other Ch. 11 cases then pending in this unit by the extent of its operations and corporate complexities. One would expect under the circumstances that an attorney who has regularly been appointed by the Bankruptcy Court in Detroit in comparably complex cases would have the relevant experience that would make him an attractive candidate to the creditors committee.

This Court observes that almost all of the Ch. 11 "regulars" with offices in greater Flint were appointed or privately retained to represent parties or creditors in this case. This Court does not take the position, however, that unless all of the competent Ch. 11 lawyers are already appointed or represent creditors or equity security holders, local rates apply to regional or metropolitan attorneys who accept appointment by the Court. The Flint-based attorneys who represented other parties in the case should, and may, have welcomed "tilting in the lists" with an experienced insolvency lawyer from Detroit.

From the Court's perspective, appointment of regional or metropolitan counsel also has a prophylactic effect on the administration of bankruptcy cases. Such counsel often enjoy the independence which is required to take an appeal from an erroneous ruling of or abuse of discretion by the bankruptcy court; one need not emphasize perhaps that local counsel perceive themselves as constrained in taking appeals when their professional income is dependent upon favorable re-

view of fee petitions in the mine run of cases by the one or two bankruptcy judges in town. In addition, appointment of regional or metropolitan counsel may also introduce insightful or innovative strategies in the formulation of plans or the prosecution of claims in adversary proceedings.

The dark side of limiting regional or metropolitan attorneys to local rates is to protect parochial values and the cozy comfort of a close-knit professional family of bench-and-bar. That form of professional inbreeding has, unfortunately, led to widespread public suspicion of impropriety or corruption. An effective antidote is to open appointments to all qualified applicants.

*Id.,* 27 B.R. at 822–23.

Against this backdrop of recent case law, the Court must consider these applications. It must be noted that fee decisions in civil rights cases have often provided guidance to bankruptcy courts in making allowances under the Bankruptcy Act and the Code. *See e.g., Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974); *Copeland v. Marshall,* 641 F.2d 880 (D.C. Cir.1980). But it is the Bankruptcy Code itself and the intent of Congress in enacting Section 330 that are dispositive of the issue before the Court. *Cf. Blum v. Stenson, supra* (resolution of the issues "begins and ends with an interpretation of the attorney's fee statute"); *Hensley v. Eckerhart, supra* (the standards set forth are generally applicable to all cases in which Congress has authorized an award of fees to a "prevailing party").

Allowances of professional compensation under the Bankruptcy Act were governed by former Bankruptcy Rule 219(c) which required the Court to take into account "conservation of the estate and the interests of creditors." Economy of administration became the paramount consideration. *See Matter of U.S. Golf Corp.* 639 F.2d 1197 (5th Cir.1981). *See generally,* 3A COLLIER ON BANKRUPTCY ¶ 62.05[1], at 1427–28 (14th ed 1975). Section 330 of the Code was the result of a deliberate

change in Congressional policy, which is best exemplified by the different standards proposed by the Report of the Commission on the Bankruptcy Laws of the United States, the House Report on H.R. 8200, and the Senate Report on S.2266. *See generally,* Anderson & Miller, "New Rules for Compensation in Bankruptcy Proceedings," 86 Comm.L.J. 79, 84–85 (1981).

The bankruptcy bill proposed by the Commission on the Bankruptcy Laws of the United States would have retained the "economic spirit" of the Bankruptcy Act. *See* Note accompanying Section 4–404(c), Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93–137, 93d Cong., 1st Sess. Pt. I at 108–09 (1973). The Senate Report accompanying S.2266, likewise, would have limited professional fees to "the lower end of the spectrum of reasonableness." The Report states in pertinent part:

Section 330 authorizes the court to award compensation for services and reimbursement of expenses of officers of the estate, and other professionals. The compensation is to be reasonable, for economy in administration is the basic objective. Compensation is to be for actual necessary services, based on the time spent, the nature, the extent and the value of the services rendered, and the cost of comparable services in non-bankruptcy cases. There are the criteria that have been applied by the courts as analytic aids in defining "reasonable" compensation.

The reference to "the cost of comparable services" in a nonbankruptcy case is not intended as a change of existing law. In a bankruptcy case fees are not a matter for private agreement. There is inherent a "public interest" that "must be considered in awarding fees," *Massachusetts Mutual Life Insurance Co. v. Brock,* 405 F.2d 429, 432 (CA5, 1968), cert. den., 395 U.S. 906, [89 S.Ct. 1748, 23 L.Ed.2d 220] (1969).

S.Rep. No. 95–989, 9th Cong., 2d Sess. 40 (1978), 1978 U.S. Code Cong. & Admin. New, p. 5826.

The House of Representatives adopted a contrary position, and based fee awards on "the cost of comparable services" rather than on principles of economy. The Report accompanying H.R. 8200 emphasizes the importances of attracting the highest caliber of professional persons to bankruptcy practice.

The compensation is to be reasonable, for actual necessary services rendered, based on the time, the nature, the extent, and the value of the services rendered, and on the cost of comparable services other than in a case under the bankruptcy code. The effect of the last provision is to overrule *In re Beverly Crest Convalescent Hospital, Inc.*, 548 F.2d 817 (9th Cir.1976, as amended 1977), which set an arbitrary limit on fees payable, based on the amount of a district judge's salary, and other, similar cases that require fees to be determined based on notions of conservation of the estate and economy of administration. If that case were allowed to stand, attorneys that could earn much higher incomes in other fields would leave the bankruptcy arena. Bankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously, would be driven elsewhere, and the bankruptcy field would be occupied by those who could not find other work and those who practice bankruptcy law only occasionally almost as a public service. Bankruptcy fees that are lower than fees in other areas of the legal profession may operate properly when the attorneys appearing in bankruptcy cases do so intermittently, because a low fee in a small segment of a practice can be absorbed by other work. Bankruptcy specialists, however, if required to accept fees in all of their cases that are consistently lower than fees they could receive elsewhere, will not remain in the bankruptcy field.

H.R. 95–595, 95th Cong., 1st Sess. 329–30 (1977), U.S. Code Cong. & Admin. News 1978, p. 6286.

In the end, the liberal standard of compensation proposed by the House prevailed and the "economy principle" was abolished.

The joint explanatory statement of the floor managers indicates the unmistakable intent of Congress to change prior practice.

Section 330(a) contains the standard of compensation adopted in HR 8200 as passed by the House rather than the contrary standard contained in the Senate amendment. Attorneys' fees in bankruptcy cases can be quite large and should be closely examined by the court. However bankruptcy legal services are entitled to command the same competency of counsel as other cases. In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11. Contrary language in the Senate report accompanying S 2266 is rejected, and Massachusetts Mutual Life Insurance Company v. Brock, 405 F2d 429, 432 (5th Cir 1968) is overruled. Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.

124 Cong.Rec. H11091 (daily ed. Sept. 28, 1978) (remarks of Representative Edwards); 124 Cong. Rec. S17408 (daily ed. Oct. 6, 1978) (remarks of Senator DeConcini). *Cf. In re McLean*, 6 B.R. 327, 328, Bankr.L.Rep. (CCH) ¶ 67, 638, 2 C.B.C.2d 1260 (Bkrtcy.E.D.Va.1980) ("With the advent of the Bankruptcy Code came the abolition of the economy principle, a time-honored yet curious notion that attorneys practicing bankruptcy should be paid less than those practicing in other forums"). *See generally,* Butenas, "Establishing Attorney's Fees Under the New Bankruptcy Code," 37 The Bus.Law. 77 (1981); Anderson & Miller, "New Rules for Compensation in Bankruptcy Proceedings," 86 Comm.L.J. 79 (1981).

Congress intended for market rates to govern allowances of fees in bankruptcy cases. It would be contrary to the clear intent of Congress to impose community based wage controls over professional

fees. Attorneys' hourly rates are fixed by the market in which they customarily practice, not by the Court. The stress of competition tends to establish market rates for professional services, which may not be uniform throughout the nation. Experience has shown that only in unusually large cases with significant creditor interest do out-of-state counsel actively participate in proceedings before this Court.[23] In such cases, the Court is free to look to a national market in making fee allowances. The bankruptcy court does not sit as a wage board.[24]

### Conflicts of Interest

(1) *Ernst & Whinney.* The debtor asks the Court to disallow the fees and costs sought by Ernst & Whinney in their entirety based upon an alleged conflict of interest. Ernst & Whinney's representation of an interest adverse to the estate is exemplified by the debtor in a letter sent by the Toronto office of Ernst & Whinney to the debtor on behalf of a group of investors in a film project. The letter stated that Ernst & Whinney was the investors' representative and in their opinion and that of their attorneys the filing of Chapter 11 constituted a default by Jensen-Farley Pictures under the film distribution agreement. Ernst & Whinney demanded an accounting and advised that they had instructed the Canadian film laboratory handling the film to refuse Jensen-Farley and their assigns and successors all access to the master negative. In the debtor's view this action constitutes a representation of interests adverse to the estate in violation of Section 1103(b) and warrants denial of all fees and costs under Section 328(c).

The conflict of interest question is not susceptible to resolution on the present state of the record. Although argued and briefed by the debtor, the arguments and memoranda submitted by Ernst & Whinney do not address or even mention this matter. A further hearing must be held to determine whether all fees and expenses requested by Ernst & Whinney must be denied or reduced under Section 328(c).[25]

Section 1103(a) does not specifically require accountants employed by a creditors' committee to be "disinterested persons" as that term is defined in Section 101(13) of the Code. If, however, such accountants are not "disinterested persons," compensation for services rendered and reimbursement for expenses incurred may be denied by the Court unless adequate disclosure is made and prior approval of the Court is obtained. 11 U.S.C. § 328(c). In its ex parte application to employ accountants, the creditors' committee failed to disclose the relationship of Ernst & Whinney to the debtor. *See* Bankruptcy Rule 2014(a). Those who seek appointments as professional persons in bankruptcy cases owe the duty of complete disclosure of all facts bearing upon their eligibility for such appointment. *See Matter of Futuronics Corp.*, 655 F.2d 463, 469 (2d Cir.1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982). If the application had disclosed Ernst & Whinney's affiliation with an interest adverse to the estate with respect to the matter on which they were to be employed, the appointment would have been denied.

(2) *Arthur Young & Company.* In considering the application of Arthur Young &

---

**23.** This case is national in scope. The creditor mailing matrix filed with the Court reflects that Jensen-Farley Pictures has creditors in 45 States, the District of Columbia, Canada, Mexico, and England.

**24.** The Bankruptcy Court in *Wilson Foods* applied the "unusual circumstances" exception recognized in *Ramos* to allow counsel for various professionals to charge the rates they normally charged clients in their respective regions of the country. In holding that the market-based standard of Section 330 includes a national market

in certain cases, this Court expresses no opinion as to the applicability of the "unusual circumstances" exception to the rule of *Ramos v. Lamm, supra.*

**25.** Elsewhere this court has had occasion to examine conflicts of interest at substantial length. *See In re Roberts*, 46 B.R. 815 (Bkrtcy. D.Utah 1985) (Clark, J.). Counsel are advised to consider that decision prior to an evidentiary hearing in this matter.

Company, accountant for the debtor, the Court must raise an issue not previously addressed by the parties or the Court. This is the question of Arthur Young & Company's eligibility to serve as accountant since it is a prepetition creditor of Jensen-Farley Pictures.

Section 327(a) authorizes the debtor in possession, subject to the Court's approval, to employ professional persons, such as attorneys, accountants, appraisers, and auctioneers, to represent or perform services for the estate. Only "disinterested" persons "that do not hold or represent an interest adverse to the estate" may be employed by the debtor in possession. H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 328 (1977), U.S. Code Cong. & Admin. News 1978, p. 6284. Section 1107 provides that "notwithstanding section 327(a) of this title, a person is not disqualified for employment by or representation of the debtor before the commencement of the case." But the phrase "disinterested person" is defined in Section 101(13) to mean someone who is "not a creditor."

The definition of "disinterested person" is adapted from Section 158 of Chapter X of the Bankruptcy Act, 11 U.S.C. § 558 (repealed). H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 310 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 23 (1978). Section 158 defined four classes of persons who were not deemed disinterested, as follows:

A person shall not be deemed disinterested, for the purposes of section 156 and section 157 of this Act, if—

(1) he is a creditor or stockholder of the debtor; or

(2) he is or was underwriter of any of the outstanding securities of the debtor or within five years prior to the date of the filing of the petition was the underwriter of any securities of the debtor; or

(3) he is, or was within two years prior to the date of the filing of the petition, a director, officer, or employee of the debtor or any such underwriter, or an attorney for the debtor or such underwriter; or

(4) it appears that he has, by reason of any other direct or indirect relationship to, connection with, or interest in the debtor or such underwriter, or for any reason an interest materially adverse to the interests of any class of creditors or stockholders.

*See also* former Bankruptcy Rule 10–202(c)(2) (superseded). Under Section 158 and Bankruptcy Rule 10–202(c), it was conclusively presumed that a person who is a creditor was incapable of the impartial judgment required in the administration of the Chapter X case. *See Matter of Realty Associates Securities Corp.*, 56 F.Supp. 1007 (E.D.N.Y.1944). The requirement of disinterestedness was rigidly applied in Chapter X. *See e.g., In re Ocean City Automobile Bridge Co.*, 184 F.2d 726, 728 (3d Cir.1950); *Meredith v. Thralls*, 144 F.2d 473, 474 (2d Cir.), *cert. denied*, 323 U.S. 758, 65 S.Ct. 92, 89 L.Ed. 607 (1944).

 In its application for appointment as accountant in this case, Arthur Young & Company did not disclose its status as a prepetition creditor of Jensen-Farley Pictures, with an unsecured claim exceeding $48,000. Had it done so, the Court would have denied the appointment or authorized it subject to waiver by Arthur Young & Company of its prepetition claim. *See In re Roberts, supra*, note 25. Since Arthur Young & Company is not, and at the time of its appointment was not, a disinterested person, the Court may in its discretion disallow all compensation and reimbursement of expenses. *See* 11 U.S.C. § 328(c). The Court must ultimately decide whether Arthur Young & Company should be allowed to cure the disqualifying circumstance by permitting the accountant to waive its prepetition claim at this time. Since neither the debtor, the creditors' committee, nor the Court previously raised the conflicts of interest question with respect to Arthur Young & Company, it would be unfair to rule on this matter without giving the accountant an opportunity to be heard.

### Guidelines for the Preparation and Presentation of Fee Applications

Few subjects have received so much attention in the reported decisions of the

bankruptcy courts as compensation for professional services. It is curious that after all that has been written on the subject, there is still no adequate set of guidelines for the preparation and presentation of fee applications. For the benefit of the bankruptcy bar in the district and certainly not for this case alone, the Court perceives the need to identify the principles and considerations which govern its fee decisions.[26]

■■■ *Notice.* Consideration of fee requests by professional persons employed under Sections 327 and 1103 of the Code requires notice and a hearing by the Court. 11 U.S.C. §§ 330, 331. Bankruptcy Rule 2002(a)(7) requires 20 days notice by mail to all creditors of hearings on applications for compensation or reimbursement of expenses totaling in excess of $100. The notice must identify the applicant and the amount requested. Bankruptcy Rule 2002(c)(2). In addition, this Court may require the notice to identify the dates and amounts of prior allowances of interim compensation. An applicant is not permitted to estimate fees and costs which will be incurred after filing the application and prior to the hearing thereon. Those fees and expenses should be included in the subsequent application. *See In re Ritz Carlton Restaurant & Hotel Co.,* 60 F.Supp. 861, 867 (D.N.J.1945); *Matter of Liberal Market, Inc.,* 24 B.R. 653, 663, 9 B.C.D. 1216 (Bkrtcy.S.D.Ohio 1982).

■■■ *Content of Application.*[27] Bankruptcy Rule 2016 provides that the fee application filed with the Court must contain a detailed statement of (1) the services rendered, (2) time expended, (3) expenses incurred, and (4) amounts requested. In addition, the rule requires that the application contain a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in connection with the case, the source thereof, and whether any fee sharing agreement exists. The application need not be the size of a "boring Victorian novel," *In re Hotel Associates, Inc.,* 15 B.R. 487, 488, 5 C.B.C.2d 669 (Bkrtcy.E.D.Pa.1981), but should contain a narrative description of the proceedings, the problems involved, the difficulty of the problems, how each problem was resolved, and what results were achieved. *See In re Lafayette Radio Electronics Corp.,* 16 B.R. 360, 361 (Bkrtcy.E.D.N.Y.1982). The application may also contain a description of the status, experience, and background of the applicant. Either the application or the time records should include a summary of the normal hourly billing rates of each professional and para-professional and the total hours for each.

■■■ *Verification.* Authority for the allowance and payment of expenses to professional persons is found in Sections 330 and 331 of the Code. Bankruptcy Rules 2002 and 2016 prescribe the procedure for making application to the Court for such allowances. The Bankruptcy Rules neither require nor provide for the verification of fee applications. *Compare* Bankruptcy Rule 2016 *with* Bankruptcy Rule 9011(b).[28] *See also* former Bankrupt-

---

**26.** While the practice of bankruptcy law is complex, the court is desirous of, and administration of justice requires, a system open to competent members of the general bar and the elimination of even the appearance of a "closed shop." *See Matter of Allard,* 20 B.R. 902, 904, 9 B.C.D. 298, 6 C.B.C.2d 926 (Bkrtcy.E.D.Mich. 1982), vacated, 23 B.R. 517, 9 B.C.D. 641, 7 C.B.C.2d 854 (E.D.Mich.1982). *Cf. In re Riding,* 44 B.R. 846 (Bkrtcy.D.Utah, 1984). Writing an opinion on each of the numerous fee applications that are presented to the Court would be both exceedingly time consuming and an inefficient use of judicial resources. *In re Standard Poultry Co., Inc.,* 5 B.R. 643 (Bkrtcy.E.D.Pa. 1980).

**27.** A request for an allowance of interim compensation and reimbursement of expenses is by application to the bankruptcy court and not by motion, petition, or filing a proof of claim. *See* 11 U.S.C. § 331; *In re Taylor Transport Inc.,* 28 B.R. 832, 10 B.C.D. 426, 8 C.B.C.2d 289 (Bkrtcy. N.D.Ohio 1983). *Compare* Bankruptcy Rule 2016(a) *with* Bankruptcy Rule 9013.

**28.** Pleadings and papers which require verification or an affidavit are (1) petitions, schedules, statements of financial affairs, and Chapter 13 statements and amendments (Bankruptcy Rule 1008); (2) lists of multiple proxies and statements of facts and circumstances regarding their acquisition (Bankruptcy Rule 2006(e)); (3)

cy Rules 219(a) and 911(b). Nonetheless, the practice has developed in this and other jurisdictions of submitting verified applications for allowance of compensation and reimbursement of expenses. A verification, as used in connection with fee applications in bankruptcy cases, is nothing more than a confirmation of the truth and correctness of the time records submitted to the Court. Its object is to assure the good faith and authenticity of those records. A verification is not a substitute for testimony in support of a contested fee application, nor does it limit the Court's inquiry as to the services rendered or reasonableness of the fee sought. In this Court's view, the signature of the attorney or other professional who submits a fee application constitutes a certificate by him of the correctness of his time records of services actually rendered. *See* Bankruptcy Rule 9011(a). A verification is not required in order to impress upon an attorney's conscience the necessity of truthfulness in the matters set forth in the fee application.

 *Time Records.* Professional persons who intend to seek compensation from debtors' estates should maintain meticulous contemporaneous time records and such records should reveal sufficient data to enable the Court to make an informed judgment about the specific tasks and hours allotted. *In re Wilson Foods Corp., supra,* 36 B.R. at 320. The determination of the adequacy of time records submitted with fee applications is left to the Court, and where necessary the bankruptcy judge is free to require an applicant to testify or produce additional documentation. If the applicant does not keep or submit the required records, the Court will resolve every doubt against the applicant. *In re Underground Utilities Construction Co., Inc.,* 13 B.R. 735, 737 (Bkrtcy.S.D.Fla.1981). It would be helpful to the Court if time records were arranged in tabular form with entries in four columns, listing (1) the date upon which professional services were per-

formed, (2) a concise description of the services rendered, (3) the time spent expressed to the nearest tenth of an hour, and (4) the name or initials of the professional or paraprofessional who performed the services. Where abbreviations other than those in general usage are employed, a key to such abbreviations should be included. *Cf. In re Horn & Hardart Baking Co.,* 30 B.R. 938, 939 (Bkrtcy.E.D.Pa.1983) (applications rendered meaningless by constant use of abbreviations).

 The Court is aware that time and record keeping are tasks that most lawyers dislike and do not always perform well. *In re City Planners & Developers, Inc.,* 5 B.R. 217, 219, 6 B.C.D. 707, 2 C.B. C.2d 700, 69 A.L.R.Fed. 639 (Bkrtcy.D.P.R. 1980). But without accurate detailed time records the Court lacks any objective basis for making a fee award. Without specificity, fee proceedings become unduly burdensome to the Court and parties in interest. It may lead to reduction in compensable hours or to a denial of compensation without prejudice to renewing the request upon the submission of additional documentation. But seldom will a party's failure to provide sufficient documentation result in an outright denial of compensation. In most cases, deficiencies in documentation are cause for reduction, rather than outright denial, of fees. *See Hensley v. Eckerhart, supra,* 461 U.S. at 433, 103 S.Ct. at 1939. The record keeping requirement, while obviously important, "should not be imposed in a draconian manner." *See Action on Smoking and Health v. C.A.B.,* 724 F.2d 211, 220 (D.C.Cir.1984). It will generally be satisfied if the Court can from the application alone, or from the application and such further evidence as is presented at the hearing determine all aspects of the services performed. *See Matter of Texas Gulf Industries, Inc.,* 4 B.C.D. 186, 191 n. 8 (Bkrtcy.S.D.Tex.1978). In this regard, the standards for detail and specificity for the records set forth by the court

motions for *ex parte* relief from the automatic stay (Bankruptcy Rule 4001(c)); (4) motions for temporary restraining orders (Bankruptcy Rule 7065); and (5) emergency motions on appeal (Bankruptcy Rule 8011). *See* Advisory Committee Note, Bankruptcy Rule 9011(b).

in *In re Nation/Ruskin, Inc.*, 22 B.R. 207 (Bkrtcy.E.D.Pa.1 may be overexacting. *But cf., Cohen & Thiros v. Keen Enterprises Inc.*, 44 B.R. 570, 573 (N.D.Ind.1984) (adopting *Nation/Ruskin* standards). Nonetheless, time records should "substantially reflect the work performed." *See In re City Planners & Developers, Inc.*, supra, 5 B.R. at 219.[29]

▮▮▮▮▮▮ *Billing Judgment.* It is a familiar practice for law firms to make certain billing adjustments and exclude time for unproductive efforts. Attorneys requesting compensation under Sections 330 and 331 should take heed of the advice given by the Supreme Court in *Hensley v. Eckerhart, supra,* and exercise "billing judgment" when applying to the Court for allowance of fees in the same manner that they use such judgment when presenting bills to their clients. The Court offers the following guidelines to fee applicants as to the appropriate exercise of billing judgment in bankruptcy cases.[30] When more than one attorney attends a hearing, unless each actively participates, no fee or a reduced fee should be sought for non-participating counsel. *See Impro Products, Inc. v. Block,* 569 F.Supp. 1389, 1397 (D.D.C. 1983), *rev'd without opinion,* 737 F.2d 1206 (D.C.Cir.1984); *In re Erewhon, Inc., supra,* 21 B.R. at 85. Non-legal work performed by a lawyer which could have been performed by less costly non-legal employees should command a lesser rate. *See In re Anthracite Coal Antitrust Litigation,* 81 F.R.D. 499, 510 (M.D.Pa.1979); *In re Auto-Train Corp.,* 15 B.R. 160, 162 (Bkrtcy.D.D.C.1984). Unproductive travel time should also be billed at a reduced rate. *See In re Four Star Terminals, Inc., supra,* 42 B.R. at 437; *In re Global International Airways, Inc.,* 38 B.R. 440, 445 (Bkrtcy.W.D.Mo.1984); *In re International Coins & Currency, Inc.,* 22 B.R. 127, 130, 7 C.B.C.2d 163 (Bkrtcy.D.Vt.1982). *Cf. Society for Good Will to Retarded Children v. Cuomo,* 574 F.Supp. 994, 997–98 (E.D.N.Y.1983), *vacated,* 737 F.2d 1253 (2d Cir.1984) (time spent in transit may be beneficial, but is not as productive as time spent at the office or in court). This Court will permit professionals reasonable compensation for time spent in preparing their fee applications because it believes accurate and detailed applications prepared in accordance with the Bankruptcy Code and Rules aid in the administration of the case and do more than serve the self-interest of the person seeking fees. *See Rose Pass Mines, Inc. v. Howard,* 615 F.2d 1088 (5th Cir.1980); *In re Bible Deliverance Evangelistic Church, supra,* 39 B.R. at 774–75, *In re Warrior Drilling & Engineering Co., Inc.,* 9 B.R. 841, 848–49, 7 B.C.D. 618

**29.** The larger, longer and more complex the case, "the greater the possibility that overstatements will creep into the figures, no matter how carefully they are compiled." *Desimone v. Industrial Bio-Test Laboratories,* 83 F.R.D. 615, 622 (S.D.N.Y.1979). Where fees are sought for office conferences, telephone conversations or correspondence, the better practice is to briefly set forth the nature and substance of each conference, phone call, or letter. *See In Re Four Star Terminals, Inc.,* 42 B.R. 419, 426 n. 1, 12 B.C.D. 197, 11 C.B.C.2d 47 (Bkrtcy.D.Ala.1984); *In re Art Shirt Ltd., Inc.,* 30 B.R. 318, 320 (Bkrtcy.E.D.Pa.1983); *In re Doyle-Lunstra Sales Corp.,* 19 B.R. 1003, 1006 (Bkrtcy.S.D.1982); *Matter of Hamilton Hardware Co., Inc.,* 11 B.R. 326, 330–31, 7 B.C.D. 963, 4 C.B.C.2d 699 (Bkrtcy.E.D.Mich.1981); *Matter of Texas Gulf Industries, Inc., supra,* 4 B.C.D. at 191 n. 8. These disclosures should not have attorney-client privilege implications. Fees paid for legal work and the general nature of legal work performed do not constitute a confidential communication and are, therefore, outside the attorney-client privilege. *United States v. Hodgson,* 492 F.2d 1175, 1175 (10th Cir.1974). Applicants should refrain from excessive "lumping" of several services under one time entry. It is difficult for the court to determine from such entries the amount of time actually allocated to each specific task. *See Cohen & Thiros v. Keen Enterprises, Inc., supra,* 44 B.R. at 573, *In re Bible Deliverance Evangelistic Church,* 39 B.R. 768, 777 (Bkrtcy.E.D.Pa.1984); *In re Art Shirt Ltd., Inc., supra,* 30 B.R. at 322–23; *In re Horn & Hardart Baking Company, supra,* 30 B.R. at 940; *In re Nation/Ruskin, Inc., supra,* 22 B.R. at 210; *In re Erewhon,* 21 B.R. 79, 83, 9 B.C.D. 288 (Bkrtcy.D.Mass.1982); *In re Garland Corp.,* 8 B.R. 826, 836 (Bkrtcy.D.Mass.1981).

**30.** The fee application should state the number of hours excluded and the reason for the exclusion. *See National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1327–28 (D.C.Cir.1982).

(Bkrtcy.N.D.Ala.), *modified* 18 B.R. 684 (N.D.Ala.1981). *Contra, In re THC Financial Corp.,* 659 F.2d 951 (9th Cir.1981), *cert. denied sub nom, Tanaka v. Creditors' Committee # 1,* 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852 (1982); *In re Hotel Associates, Inc.,* 28 B.R. 332 (Bkrtcy. E.D.Pa.1983); *Matter of Liberal Market, Inc.* 24 B.R. 653, 9 B.C.D. 1216 (Bkrtcy.S.D. Ohio, 1982); *Matter of Seatrain Lines, Inc.,* 21 B.R. 194 (Bkrtcy.S.D.N.Y.1982); *In re Pacific Homes,* 20 B.R. 729, 738 (Bkrtcy. C.D.Cal.1982). However, it would be appropriate to bill this at a reduced rate.

■■■ Some courts have held that "routine and ministerial services," *i.e.,* telephone conversations, correspondence and attending meetings, should be compensated at a lower rate than "truly legal services" such as litigation, settlement negotiations, research, and document drafting. *See, e.g., Matter of Ferkauf, Inc.,* 42 B.R. 852, 858 (Bkrtcy.S.D.N.Y.1984); *In re Sapolin Paints, Inc.,* 38 B.R. 807, 811, 11 B.C.D. 875, Bankr.L.Rep. (CCH) ¶ 69,808, 10 C.B. C.2d 833 (Bkrtcy.E.D.N.Y.1984); *Matter of Minton Group, Inc.,* 33 B.R. 38, 41, 10 B.C.D. 1233 (Bkrtcy.S.D.N.Y.1983); *Matter of Dee's Resort Wear, Inc.,* 25 B.R. 591, 591–92 (Bkrtcy.M.D.Fla.1982); *In re Doyle-Lunstra Sales Corp., supra,* 19 B.R. at 1003; *In re Hamilton Hardware Co., supra,* 11 B.R. at 331. In this Court's view, this is an unwarranted distinction, which is contrary to the fundamental notion that counsel should be encouraged to resolve matters informally whenever possible in order to avoid costly litigation.

■■■ The debtor contends that Teitelbaum & Gamberg "overused" senior partners, who performed services which presumably could and should have been rendered by associates or paralegals at lower rates. Its assertion is predicated on the bare fact that "eighty-four percent of Teitelbaum & [Gamberg's] billings represent partner time at maximum rates." Memorandum in Support of Objection to Fee Application at 18. In view of the fact that no evidence has been offered to challenge the number of hours expended or that the services were otherwise inefficiently handled, the Court rejects the debtor's invitation to reduce the fee on this basis alone. The Court agrees with the following analysis of the District Court for the District of Columbia in *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 366, (D.D.C.1983), *aff'd in part and remanded in part,* 746 F.2d 4 (D.C.Cir.1984):

This Court concludes that the allocation of responsibility between partners, associates and paralegals with respect to most tasks is a function of many variables and that there is no uniform approach that applies in all instances. "It is an inherent part of an attorney's tasks to determine what types of expertise should be brought to bear on a legal problem," *Connors v. Drivers, Chauffeurs & Helpers Local Union,* 639, C.A. 82–1840, slip op. at 15, (D.D.C. March 4, 1983) and "[a]bsent a clear misallocation of resources, this Court is unwilling to second-guess counsel's judgment." *Id.*

(Footnote omitted).

■■■ *Expenses.* The fee application should include a detailed list of expenses for which reimbursement is sought, including date, type and amount. Expenses must be actual, not estimates. *In re Marsh,* 14 B.R. 615, 617, 5 C.B.C.2d 106 (Bkrtcy.E.D. Va.1981). Undocumented expenses will not be allowed. *See In re G.W.C. Financial & Insurance Services, Inc.,* 8 B.R. 122, 7 B.C.D. 109, 3 C.B.C.2d 529 (Bkrtcy.C.D.Cal. 1981). There exists some disagreement among the courts as to which expenses may be properly charged to the debtor's estate and which are normal overhead expenses included in the firm's billing rates. Overhead, for the purpose of determining reimbursable costs in bankruptcy cases, includes all continuous administrative or general costs or expenses incident to the operation of the firm which cannot be attributed to a particular client or case. The term is not definable with exact precision, but may be exemplified by such items as rent, taxes, insurance, lighting, heating, and other office expenses, including secretarial services. While some courts have disallowed

charges for meals,[31] word processing,[32] messenger service,[33] taxi fares and parking,[34] photocopying and postage [35] express mail services,[36] and legal computer costs [37] it seems appropriate to this Court to allow such costs in view of the practice within the profession of billing them to regular clients. Disallowance of such costs would likely result in increased hourly billing rates, probably at a greater expense to debtors' estates.

 *Objections to Fee Requests.* Local Rule 27(d) of this Court provides that a notice of hearing include a statement that the relief requested may be granted without an actual hearing unless timely objection is made. This rule has no application to fee requests. Where no objections are raised to a fee request, the Court is not bound to award the fee as prayed. The Court has a duty, regardless of whether objections are filed, to determine the reasonableness of all fee requests.[38] *In re Watson Seafood & Poultry Co., Inc.,* 40 B.R. 436, 438 (Bkrtcy.E.D.N.C.1984); *In re Werth,* 32 B.R. 442, 444 (Bkrtcy.D.Colo. 1983); *In re Crutcher Transfer Line, Inc.,* 20 B.R. 705, 710 (Bkrtcy.W.D.Ky.1982); *Matter of Hamilton Hardware Co., Inc., supra,* 11 B.R. at 329.[39] The Court is

familiar with fees charged in the legal profession and is experienced at evaluating the quality of legal work. Therefore, no expert opinion evidence is needed on the issue, though such evidence may be received. *See In re First Colonial Corp. of America,* 544 F.2d 1291, 1300 (5th Cir.1977).

 An objection to a fee request is a contested matter within the meaning of Bankruptcy rule 9014 and the fee opponent may have the opportunity to request discovery. *See Stolkin v. Nachman,* 472 F.2d 222, 228 (7th Cir.1973). The Court would suggest and urge that attorneys who challenge fee applications do so in a discreet and professionally courteous manner. Objections should be as specific as possible and generalized and conclusory statements that the applicant is seeking too high a fee, unsupported by averments that challenge certain hours as excessive or the like, will not justify a fee reduction.

 *The Standard for Determining Fee Awards Under the Bankruptcy Code.* The basic statutory authority governing allowances of compensation to professional persons for services rendered in bankruptcy cases is set forth in Section 330. That provision authorizes the Court to award reasonable compensation for actu-

**31.** *In re Sapolin Paints, Inc.,* 38 B.R. 807, 11 B.C.D. 875, Bankr.L.Rep. (CCH) ¶ 69,808, 10 C.B.C.2d 833 (Bkrtcy.E.D.N.Y.1984).

**32.** *Id.*

**33.** *In re City Planners & Developers, Inc., supra,* 5 B.R. at 219.

**34.** *In re Coconut Grove Bayshore, Inc.,* 33 B.R. 194, 195 (Bkrtcy.S.D.Fla.1983).

**35.** *In re Southern Industrial Banking Corporation,* 41 B.R. 606, 614 (Bkrtcy.E.D.Tenn.1984); *In re Horn & Hardart Baking Co., supra,* 30 B.R. at 945.

**36.** *In re Citizens Mortgage Investment Trust,* 37 B.R. 813, 823 (Bkrtcy.D.Mass.1984).

**37.** *In re Four Star Terminals, Inc.,* 42 B.R. 419, 427 n. 1 (Bkrtcy.D.Alaska 1984); *In re Bible Deliverance Evangelistic Church,* 39 B.R. 768, 778 (Bkrtcy.E.D.Pa.1984); *In re Sapolin Paints, Inc., supra,* 38 B.R. at 816; *In re Citizens Mortgage Investment Trust, supra* note 36, at 823; *In*

*re Coconut Grove Bayshore Inc., supra,* 33 B.R. at 196. *Cf. In re Lafayette Radio Electronics Corporation,* 16 B.R. 360, 362 (Bkrtcy.E.D.N.Y. 1982) (disapproving billing of partner time for *Lexis* research).

**38.** The approval of attorneys' fees in bankruptcy cases is considered to be essentially judicial in nature, even though the application is unopposed. *See Hearings on S.2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 95th Cong., 1st Sess. 482 (1977) (Prepared Statement of Harold Marsh, Jr., Chairman, Commission on the Bankruptcy Laws of the United States).

**39.** Most fee applications are unopposed. Attorneys have been traditionally reluctant to question another attorney's fee application. *See In re Underground Utilities Construction Co., Inc.,* 13 B.R. 735, 736 (Bkrtcy.S.D.Fla.1981). Objections to fee requests often invite retaliation, as is apparently the situation in present case. *Cf. Matter of Hamilton Hardware Co., Inc., supra,* 11 B.R. at 330.

al, necessary services rendered based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services in a nonbankruptcy case. 11 U.S.C. § 330(a)(1). No attempt is made to define "reasonable," "actual," "necessary," or the scope of compensable professional "services", or to suggest what types of nonbankruptcy services are "comparable." *Cf. In re City Planners & Developers, Inc., supra,* 5 B.R. at 219. Inasmuch as these terms are not defined in the Code and are all more or less subjective, the search for a set of objective criteria has led most courts to adopt an hours-based approach to setting fees. The hours-based or "lodestar" approach begins with multiplying a reasonable hourly rate by the number of hours reasonably expended. This "lodestar" fee represents an "initial estimate," *Hensley v. Eckerhart, supra,* 103 S.Ct. at 1939, which is then adjusted to take into account other factors to arrive at the ultimate fee allowance. *See e.g., In re Yermakov,* 718 F.2d 1465, 1471 (9th Cir.1983); *In re AOV Industries, Inc.,* 43 B.R. 468, 472 (D.D.C. 1984); *In re Four Star Terminals, Inc., supra,* 42 B.R. at 430; *Matter of Daylight Transport, Inc.,* 42 B.R. 20, 23 (Bkrtcy.E. D.N.Y.1984); *In re Southern Industrial Banking Corp., supra,* 41 B.R. at 612; *Matter of Nor-Les Sales, Inc.,* 32 B.R. 900, 902–03 (Bkrtcy.E.D.Mich.1983); *In re Chou-Chen Chemicals, Inc.,* 31 B.R. 842, 847 (Bkrtcy.W.D.Ky.1983); *In re Casco Bay Lines, Inc., supra,* 25 B.R. at 755. It is plain to see that hours alone are a false criteria for fixing professional compensation in bankruptcy cases.[40] In *In re International Coins & Currency, Inc.,* 26 B.R. 256, 262, C.B.C.2d 780 (Bkrtcy.D.Vt.1982), the court stated:

> Undue emphasis on the factor of time fails to acknowledge the fact that skill and experience may accomplish much in

a short period of time. It also ignores the fact that some services are routine and ordinary while others involve complex and difficult issues.

The factors set forth in Section 330 are not exhaustive. *In re Garland Corp.,* 8 B.R. 826, 829 (Bkrtcy.D.Mass.1981). COLLIER notes that "[t]he only significant departure from prior law with respect to the factors involved in determining a reasonable compensation is the abandonment of the strict principle of economy. In other respects, the criteria are the same and prior case law remains relevant." 2 COLLIER ON BANKRUPTCY ¶ 330.05[2], at 330–20 (15th ed. 1984).

The Tenth Circuit has adopted the twelve well-recognized factors enunciated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), for determining the reasonableness of court awarded attorneys' fees. *See Ramos v. Lamm,* 713 F.2d 546, 552 (10th Cir.1983); *Matter of Permian Anchor Services, Inc.,* 649 F.2d 763 (10th Cir.1981); *Salone v. United States,* 645 F.2d 875 (10th Cir.), *Battle v. Anderson,* 614 F.2d 251 (10th Cir.1980); *Francia v. White,* 594 F.2d 778, 782 (10th Cir.1979). *Cf. Hensley v. Eckerhart, supra.* The *Johnson* case has gained wide recognition and is relied on by many courts in making fee allowances under the Bankruptcy Code. 1 W. Norton, NORTON BANKRUPTCY LAW AND PRACTICE ¶ 13.30, at pt. 13–p. 52 (1981). The 12 "Johnson Factors" are:

1. The time and labor required.
2. The novelty and difficulties of the question.
3. The skill requisite to perform the legal service properly.
4. The preclusion of other employment by the attorney due to acceptance of the case.
5. The customary fee.

---

**40.** One court has noted that the Bankruptcy Code carries with it the inherent danger that attorneys may come to be regarded as "hourly employees," rather than professionals whose compensation is based on a number of factors. *See In re Gloria Manufacturing Corp.,* 20 B.R.

603, 605, 9 B.C.D. 189, Bankr.L.Rep. (CCH) ¶ 68,862, 6 C.B.C.2d 1028 (Bkrtcy.E.D.Va.1982). *Cf. Miller v. Makey International, Inc.,* 515 F.2d 241, 242 (5th Cir.1975) (the lodestar approach is "mechanical" because it reduces the fee decision to "an exercise in multiplication").

6. Whether the fee is fixed or contingent.

7. Time limitations imposed by the client.

8. The amount involved and the results obtained.

9. The experience, reputation and ability of the attorneys.

10. The undesirability of the case.

11. The nature and length of the professional relationship with the client.

12. Awards in similar cases.

Commenting on the usefulness of the *Johnson* factors, the Bankruptcy Appellate Panel for the First Circuit stated: "In the practical sense, however, the delineation of twelve rubrics does little to assist in the trial court's determination of a reasonable fee allowance." *In re Casco Bay Lines, Inc.*, 25 B.R. 747, 754 (Bkrtcy.App.Pan.1st Cir.1982). The Tenth Circuit echoed this view: "[W]hile the factors set out in *Johnson* are useful, some are seldom applicable and none is self-actuating: 'simply to articulate those twelve factors ... does not itself conjure up a reasonable dollar figure in the mind of the district judge.'" *Ramos v. Lamm, supra,* 713 F.2d at 552. *Accord City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir.1974).

In general, the statutory factors under Section 330 and the *Johnson* factors consist of three components: (1) the quantity factor, comprised of documented time at customary billing rates; (2) the quality factor, comprised of the competency of the representation, taking into account the novelty and difficulty of the issues presented, the skill required, time constraints, and the personal qualifications of the applicant; and (3) the result factor, comprised of the actual results achieved in the case. *See In re Penn-Dixie Industries, Inc.,* 18 B.R. 834, 838–39, 8 B.C.D. 1134 (Bkrtcy. S.D.N.Y.1982); 1 W. Norton, NORTON BANKRUPTCY LAW AND PRACTICE § 13.30, at pt. 13– p. 53 (1981); Butenas, "Establish-

ing Attorney's Fees Under the New Bankruptcy Code, 37 The Bus.Law. 77, 79 (1981). The Supreme Court, in *Hensley v. Eckerhart, supra,* instructed courts to start by multiplying the hours reasonably spent by a reasonable hourly rate, and then, where appropriate, to apply the *Johnson* factors to increase or decrease this "initial estimate." *Id.,* 103 S.Ct. at 1939.

 It is necessary to expand briefly on the question of the "result" factor in fixing allowances of professional compensation. The standard governing allowance of fees under the former Bankruptcy Act and related Rules of Bankruptcy Procedure, which emphasized conservation of the estate and economy of administration, was replaced with one designed to be generous enough to attract professional persons of the highest ability to the practice of bankruptcy law. *See* COLLIER ON BANKRUPTCY ¶ 330.02, at 330–4 (15th ed. 1984). Congress substituted "reasonableness" and "actual" and "necessary" for "benefits conferred" as the test for fee allowances under the Code. Hours may be reasonably and necessarily spent and, therefore, be compensable under Section 330 even though the effort did not result in a benefit to the estate. *See In re Casco Bay Lines, supra,* 25 B.R. at 756; *In re Grist, supra* note 6 at 6–7).[41] *Cf.* 11 U.S.C. § 503(b) (explicitly requiring "substantial contribution" in order to be compensable). In this Court's view, a result-based analysis of fee requests under Sections 330 and 331 should be applied primarily in cases in which a "bonus" or "premium" fee is sought for extraordinary results. *See In re Casco Bay Lines, Inc., supra,* 25 B.R. at 747; *Matter of Aminex Corporation,* 15 B.R. 356, 362, 5 C.B.C.2d 155 (Bkrtcy.S.D.N.Y. 1981); *In re Warrior Drilling & Engineering Co., Inc.,* 9 B.R. 841, 7 B.C.D. 618 (Bkrtcy.N.D.Ala.), *modified,* 18 B.R. 684, 8 B.C.D. 781 (N.D.Ala.1981). *Cf. Hensley v. Eckerhart, supra,* 461 U.S. at 424 ("excel-

---

**41.** Hours are not reasonably spent if they are excessive, *i.e.,* too much time is devoted to a particular matter, or duplicative, *i.e.,* the same matters are covered at different times or by

more than one attorney. *Gingras v. Lloyd,* 585 F.Supp. 684, 687 (D.Conn.), *vacated,* 740 F.2d 210 (2d Cir.1984).

lent results" warrants a "fully compensatory fee" ' and an "enhanced award" requires "exceptional success").

 *Reexamination of Fee Awards.* Section 331 contemplates repeated application to the Court for reimbursement and compensation, subjecting the award to amendment or modification at any time during the pendency of the bankruptcy case. *In re Callister*, 673 F.2d 305, 306 (10th Cir.1982). Interim fee awards are discretionary, and subject to reexamination and adjustment during the course of the case. *Id.* They are "tentative, informal or incomplete" and, hence, interlocutory. *Id.* The Court may review the case at its conclusion and take into account the results obtained in making a final allowance. *Matter of Mansfield Tire & Rubber Co.*, 19 B.R. 125, 127 (Bkrtcy.N.D.Ohio 1981); *Matter of Pennsylvania Tire & Rubber Co.*, 19 B.R. 124, 125 (Bkrtcy.N.D. Ohio 1980).

## DECISION

Have spoken to the issues raised by these fee applications, and identified the factors to be taken into account in making an allowance, the Court now turns to each of the applications presented for consideration. After a complete and thorough review of each application, the Court renders its decision as follows.

### Application of Roe & Fowler

 The attorneys' and paraprofessional's time claimed has been adequately documented and was actually and necessarily expended. Reasonable billing judgment has been exercised and the fees sought are comparable to those billed to and paid by clients in cases other than under Title 11. The fees shall be allowed as prayed. The largest item among Roe & Fowler's expenses is $2,101.08 for "travel expenses." The Court finds that there is insufficient documentation to support reimbursement of $2,101.08 for these expenditures. The Court should not be required to speculate about the nature of such entries. Upon submission of a supplemental application

containing a detailed list of applicant's travel expenses, the Court will make an appropriate award.

### Application of Teitelbaum & Gamberg

 There has been no demonstrable benefit to the estate as a result of the prepetition services rendered by Teitelbaum and Gamberg on behalf of the unofficial creditors' committee. The prepetition services for which compensation is sought were undertaken for the benefit of sixteen creditors only and for the purpose of averting bankruptcy. Such services are not compensable from the debtor's estate and will be disallowed. As to the remainder of the application, the Court finds that the amount requested would not have been excessive if comparable services had been rendered to private clients. The fees and costs as requested by the attorneys are found to have been actually and necessarily incurred as well as reasonable, and, with one exception, they shall be allowed. Reimbursement of $128.71 for "miscellaneous" expenses shall be considered upon submission of a supplemental application containing an itemized list of those expenditures.

### Application of Ernst & Whinney

The Court finds the time records of Ernst & Whinney to be adequate and its fees and costs to have been actually and necessarily incurred. However, Ernst & Whinney declined to respond to the debtor's objection that it represents an interest adverse to the estate. The Court shall require the accountant for the creditors' committee to do so. All fees and costs sought shall be denied at this time, and Ernst & Whinney is directed to submit a memorandum of points and authorities and/or one or more affidavits addressing the conflicts of interest issue raised by the debtor within twenty (20) days and schedule a hearing on notice to parties in interest within thirty (30) days of this memorandum opinion.

## Application of Arthur · Young & Company

The prepetition accounting services and costs rendered to the debtor by Arthur Young and Company are not compensable as an administrative expense under any provision of the Bankruptcy Code. Arthur Young and Company has an unsecured claim without priority for such services and nothing more. The Court finds that its postpetition services were actually and necessarily incurred and the amounts sought are reasonable. Costs are sufficiently documented and would be allowable except for $371 for "[e]mployee expenses associated with normal business expense reimbursement policies," which requires further explanation.

Arthur Young & Company's failure to disclose its status as a prepetition creditor in its application for employment was contrary to the requirements of Bankruptcy Rule 2014, and the appointment itself was improper because the accountant was not a disinterested person. Had Arthur Young & Company disclosed its disqualifying affiliation with the debtor and waived its prepetition claim in the application for employment, it would be unnecessary to consider denial of all fees and costs as a sanction under Section 328(c). In order to give Arthur Young & Company an opportunity to be heard on this issue, the Court shall deny all fees and costs to the accountant at this time and direct it to submit a memorandum of points and authorities within twenty (20) days and schedule a hearing on notice to parties in interest within thirty (30) days of this memorandum opinion.

## CONCLUSION

The unmistakable purpose of Section 503(b) is to enable individual creditors, indenture trustees, equity security holders, unofficial committees, and custodians to recover costs and expenses for professional services of attorneys and accountants, which were reasonably incurred in aid of the administration of the estate and which inured to the benefit of the estate. The Congressional policy of encouraging nonbankruptcy workouts does not extend to allowance of fees and costs incurred in negotiating an unsuccessful workout to be allowed as an administrative priority expense.

The principle of the *Randolph* case has neither been departed from nor enlarged upon by the Bankruptcy Code. It establishes the right of a prepetition custodian, to the extent he has preserved assets and conferred a benefit upon the estate, to seek allowance from the bankruptcy court for expenses incurred when bankruptcy supersedes. It does not appear from any of the facts before the Court that the activities of the unofficial committee and its attorneys resulted in substantial benefits to the bankruptcy estate. The prepetition legal services rendered to the unofficial creditors' committee were for the benefit of the members of the committee and did not confer a benefit on the debtor's estate. Thus, they are not compensable from funds of the estate. Likewise, the prepetition accounting services rendered to the debtor by Arthur Young & Company cannot be allowed as an administrative claim.

Congress intended that market rates would govern bankruptcy fee decisions. This was a deliberate break from the arbitrary limits placed on allowances by some courts. Section 330 must be construed in the light of this Congressional intent. When attorneys and other professionals from out of state practice before this Court and seek allowances of compensation and reimbursement of expenses from the debtor's estate, they may be allowed their customary billing rates.

The Court finds that the requests for allowance of compensation for postpetition services rendered by Teitelbaum & Gamberg and Roe & Fowler are reasonable and proper under Section 330 and, except as set forth above, will allow the amounts requested as an administrative expense. A further hearing must be held to determine whether Ernst & Whinney and Arthur Young & Company have conflicts of interest in this case, and, if so, the proper remedial measure.

Counsel for the debtor shall prepare and submit an appropriate Order in accordance with the foregoing within ten (10) days.